[No. 57562-2. En Banc. September 10, 1992.]

*In the Matter of the Welfare of*
KIRSTEN KEY.

*Dennis J. Sweeney, George Fearing,* and *Leavy, Schultz & Sweeney, P.S.,* for Kelly Key.

*John B. Daly,* for Kirsten Key.

*Kenneth O. Eikenberry, Attorney General,* and *Kevin M. Hartze* and *Sharon Brown, Assistants,* for State.

UTTER, J. — The Benton County Superior Court declared 7-year-old Kirsten Key to be a dependent child within the meaning of RCW 13.34. Her mother appeals. She asserts that, absent a finding of parental unfitness, the dependency order violates her constitutional right to due process of law. We affirm the trial court, but find that most of the mother's concerns are met by our interpretation of the relevant statutes. Specifically, we hold that if the Department of Social and Health Services desires to move Kirsten against her mother's wishes, the Department must prove by clear, cogent and convincing evidence that its desired placement is

in the best welfare of the child. As admitted by the State, this dependency proceeding is consensual inasmuch as the parent has agreed that services appropriate to the child's needs cannot be provided in the home; if the parent decides that appropriate services can be provided in the home, she may withdraw her consent to this category of dependency. Should she make this determination, she will have to petition the court to modify its dispositional order. RCW 13.34.150. To sustain a dependency finding, the State will then be required to establish facts sufficient to satisfy a finding of dependency under some other category of RCW 13.34.030(2).

Kirsten is a severely disabled child. She suffers from spastic quadriplegia, cerebral palsy, respiratory distress, and osteoporosis. She is nonverbal and nonambulatory. Her osteoporosis makes it very difficult to move her. The parties agree that Kirsten is disabled within the meaning of RCW 71A.10-.020(2). Kirsten's condition is not expected to improve, and will probably worsen. She is "medically frail" and needs total, around-the-clock care.

For the first 3 years of Kirsten's life, her mother, Kelly Key, cared for her at home. Ms. Key's husband's insurance at first paid for Kirsten's medical expenses. When Ms. Key and her husband divorced in 1985, there was no longer any insurance to cover the expenses.

Ms. Key started working nights to avoid going on welfare. At the suggestion of her doctor, Ms. Key contacted the Department of Social and Health Services (the Department) and requested assistance in finding someone to care for Kirsten in the Key home while Ms. Key was at work. The Department told Ms. Key it could not provide such care for her. Report of Proceedings, at 159. In 1985, Ms. Key placed Kirsten in voluntary foster care, because she believed she had no alternative. She later took Kirsten back into her home.

In January 1987, Ms. Key could no longer find a babysitter to care for Kirsten while she worked. She again sought foster care for her daughter. Ms. Key had previously

placed Kirsten in the care of Phyllis Lawrence, a licensed foster care provider. As a result of Ms. Key's request, the Department agreed to place Kirsten in Lawrence's care. Ms. Key signed a voluntary placement agreement as authorized by WAC 388-70-013(8). Report of Proceedings, at 28; plaintiff's exhibit 1. The agreement notified Ms. Key that (1) the Department would prepare a permanency plan for Kirsten; (2) the Department might move Kirsten from the Lawrence home; and (3) "a dependency action may be required". Plaintiff's exhibit 1.

Ms. Key moved next door to the foster care provider to be closer to Kirsten. She visited Kirsten frequently, and participated in making decisions concerning Kirsten's care. Although Ms. Key originally opposed placing Kirsten in foster care, she was later pleased with the foster care placement, and wanted Kirsten to remain in Ms. Lawrence's care. The social workers who handled the Key case believe Ms. Key is a fit mother who loves her daughter. Kirsten's severe disability is the only reason she is in foster care. We have set forth these facts extensively to make evident what is clear from the record. Ms. Key is not an unfit parent in any sense.

In January 1990, the Department filed a petition in Benton County Superior Court asking that Kirsten be declared dependent. Clerk's Papers, at 74-75. The petition alleged two alternate grounds for finding dependency.

[Kirsten Key] [h]as no parent, guardian or custodian capable of adequately caring for the child, such that said child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development;

[Kirsten Key] [i]s developmentally disabled, as defined by RCW 71.20.016[1] and whose parent, guardian or legal custodian together with the department determines that services appropriate to the child's needs cannot be provided in the home.

---

[1]Repealed by Laws of 1988, ch. 176, § 1005. The definition is now contained in RCW 71A.10.020. The parties do not dispute that Kirsten meets the statutory definition of developmentally disabled.

The Benton County Superior Court held a dependency hearing on April 30 and May 1, 1990. An attorney represented Ms. Key at the hearing. An attorney and a guardian ad litem represented Kirsten. The court found Kirsten dependent, but only under the second alternative listed in the petition. The reasoning of the lower court in finding Kirsten dependent within the meaning of RCW 13.34.030(2)(d) had nothing to do with any finding of unfitness on Ms. Key's part.

At the hearing, a social worker testified that the Department might be able to provide sufficient services so that Ms. Key could take care of Kirsten in her home. There was conflicting testimony on whether Ms. Key refused the services,[2] or simply did not follow up on the services due to the beginning of the dependency proceedings.[3] The social worker also testified she believed it was in Kirsten's best interest to stay in the foster home. Kirsten's guardian ad litem also testified that Kirsten should remain in the foster home.

Ms. Key testified she is fully capable of caring for Kirsten's psychological and physical needs. She also testified, however, that the foster mother was more capable of caring for Kirsten's physical needs, and that Kirsten was healthier when in the foster home.

The court entered findings and an order of dependency on August 23, 1990. The court found Kirsten dependent within the meaning of RCW 13.34.030(2)(d).

The Legislature is cognizant of the special problems posed by developmentally disabled children. This is highlighted by the Legislature's finding:

> The legislature finds that in order for the state to receive federal funds for family foster care under Title IV-B and Title IV-E of the social security act, all children in family foster care must be subjected to periodic court review. Unfortunately, this includes children who are developmentally disabled and who

---

[2]Testimony of social worker Ruth Fabian; Report of Proceedings, at 88.

[3]Testimony of Marsha Rollings, case manager for the Division of Developmental Disabilities; Report of Proceedings, at 129.

are placed in family foster care solely because their parents have determined that the children's service needs require out-of-home placement. Except for providing such needed services, the parents of these children are completely competent to care for the children. The legislature intends by this act to minimize the embarrassment and inconvenience of developmentally disabled persons and their families caused by complying with these federal requirements.

Laws of 1983, ch. 311, § 1. The language of the statute and intent of the Legislature is clear. A court may find a developmentally disabled child dependent without a finding of parental unfitness. Moreover, this statutory definition of "dependent child" has a number of components: the statutory definition of developmentally disabled child, the level of services required for the child's care, whether those services can be provided for in-home, and the parent's consent that services appropriate to the child's needs cannot be provided in the home.

The parties do not dispute that Kirsten meets the statutory definition of developmentally disabled child. The testimony in this case indicates that Kirsten requires around-the-clock care, and that Kirsten's condition is expected to worsen. While there is conflicting testimony whether a sufficient level of services could be provided for Kirsten in her mother's home, both Kirsten's guardian ad litem and a social worker testified that it was in her best interest to remain in the foster home.

■ The difficult question concerns how to characterize Kelly Key's opposition to this dependency. In order to support a dispositional order requiring an out-of-home placement, the trial court was required to find, among other things, that the "parent . . . has determined that the child would benefit from placement outside of the home." RCW 13.34.130(1)(b)(iv). At the dependency hearing, Kelly Key testified that Phyllis Lawrence, Kirsten's foster care provider, was more capable of caring for Kirsten's physical needs and development. See Report of Proceedings, at 180. Kelly Key expressed her opinion that Kirsten's physical condition benefited from placement in foster care outside the

home. While she opposed the dependency proceeding, such opposition is not inconsistent with her belief at the time of the dependency that Kirsten's physical condition benefited from placement outside the home.

■ Ms. Key additionally complains that the Department could move Kirsten without her consent to another home of which she did not approve. This is incorrect. The statute directly addresses this area of Ms. Key's concern. RCW 13.34-.260 states:

> In an attempt to minimize the inherent intrusion in the lives of families involved in the foster care system and to maintain parental authority where appropriate, the department, absent good cause, shall follow the wishes of the natural parent regarding the placement of the child. . . . Parental authority is appropriate in areas that are not connected with the abuse or neglect that resulted in the dependency and should be integrated through the foster care team.

The specific language of this statute recognizes that parental wishes are appropriate in areas not connected with abuse or neglect. This case obviously involves no abuse or neglect on the part of the mother. If the Department decides it does not want to follow the wish of Ms. Key regarding placement of the child, the Department must prove it has good cause for such a determination. In matters under this statute dealing with a concerned parent, such as Ms. Key, where no finding of parental unfitness has been alleged or made, such burden of proof must rise to the standard of clear and convincing evidence, the highest civil burden of proof.

In enacting RCW 13.34.030(2)(d), the Legislature sought to "minimize the embarrassment and inconvenience of developmentally disabled persons and their families caused by complying with" federal funding requirements and regulations. Laws of 1983, ch. 311, § 1. The Legislature's chosen approach to effect this aim while preserving eligibility for federal funding was to create an additional way for the juvenile court to establish jurisdiction over these voluntary foster placements. The reason for the legislative determination of how these matters should proceed is found in the complex labyrinth of federal

funding regulations and is mentioned in the legislative finding. Laws of 1983, ch. 311, § 1. The State argues that a dependency finding is necessary in order to comply with federal and state laws. For the State to be eligible for federal funding, the status of each child in foster care must be reviewed at least every 6 months. 42 U.S.C. §§ 627(a)(2)(B), 675(5). The federal statute allows for review by either a court or an administrative agency. 42 U.S.C. § 675(5)(B).

In order to comply with the federal requirement, the Washington Legislature decided "all children in family foster care must be subjected to periodic court review." Laws of 1983, ch. 311, § 1. The Legislature deliberately chose not to provide for administrative review, as authorized by the federal statute.

The juvenile court initially obtains jurisdiction over a minor when he or she is found to be a delinquent or dependent child, as defined by statute. *In re McDaniel*, 64 Wn.2d 273, 276-77, 391 P.2d 191 (1964); *In re Hudson*, 13 Wn.2d 673, 681, 126 P.2d 765 (1942); *see In re Chubb*, 112 Wn.2d 719, 723, 773 P.2d 851 (1989); *see also Moore v. Burdman*, 84 Wn.2d 408, 526 P.2d 893 (1974). The only way the juvenile court can conduct its legislatively required review of foster children is for the juvenile court to determine if the foster child meets the statutory criteria for a "dependent child". As Kirsten Key had not ever been declared a "dependent child", the juvenile court did not have jurisdiction to conduct the legislatively required review of her foster care placement. Thus, this explains the need for the dependency proceeding in this case.

■ The State's interest in being able to have a child declared dependent, without a finding of unfitness, is in maintaining its financial ability to provide for the physical needs of the child. Fiscal matters are a proper concern in determining whether the State's interest is sufficient to warrant the intrusion into the parent's rights. *Krause v. Catholic Comm'ty Servs.*, 47 Wn. App. 734, 743-45, 737 P.2d 280, *review denied*, 108 Wn.2d 1035 (1987). For the State to fulfill its parens patriae responsibility toward severely disabled

children such as Kirsten, this is a reasonable choice by the Legislature and does not require a finding of unfitness.

■ This is not an unconstitutional choice. The due process clause of the Fourteenth Amendment protects a parent's right to the custody, care, and companionship of her children. *Stanley v. Illinois*, 405 U.S. 645, 651, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (1972); *Prince v. Massachusetts*, 321 U.S. 158, 166, 88 L. Ed. 645, 64 S. Ct. 438 (1944); *In re Luscier*, 84 Wn.2d 135, 139, 524 P.2d 906 (1974). That right cannot be abridged without due process of law. U.S. Const. amend. 14. Ms. Key argues that, absent a finding of parental unfitness, the court's finding that Kirsten is dependent violated Ms. Key's due process rights. This is not supported by the language of the statute or the law.

Appellant cites two cases as supporting her position that a finding of unfitness is necessary. First, she cites *In re J.P.*, 648 P.2d 1364 (Utah 1982), for the proposition that declaring a child dependent absent a finding of unfitness is unconstitutional. *In re J.P.*, *supra*, does not support that proposition. *In re J.P.*, *supra*, holds only that it violates the Fourteenth Amendment to *permanently terminate* a parent's rights absent a finding of unfitness. 648 P.2d at 1366.

■ A dependency proceeding and a termination proceeding have different objectives, statutory requirements, and safeguards. *In re Hiebert*, 28 Wn. App. 905, 908, 627 P.2d 551 (1981); *compare* RCW 13.34.130 *with* RCW 13.34.180 *and* RCW 13.34.190. The key difference in the dependency hearing is "a preliminary, remedial, nonadversary proceeding" that does not permanently deprive a parent of any rights. *In re A.W.*, 53 Wn. App. 22, 30, 765 P.2d 307 (1988), *review denied*, 112 Wn.2d 1017 (1989). A finding of dependency does not inevitably lead to a termination of parental rights. *In re Churape*, 43 Wn. App. 634, 639-40, 719 P.2d 127 (1986) (fact that child in long-term foster care not determinative in deciding whether to terminate parental rights). *In re J.P.'s* focus is solely on termination proceedings. Its reasoning does not apply to dependency proceedings.

Appellant also relies on *Halderman v. Pennhurst State Sch. & Hosp.*, 707 F.2d 702 (3d Cir. 1983). The parents in *Halderman* voluntarily placed their child in a state facility for the mentally handicapped. The State later sought, against the parents' wishes, to move the child to another facility. The Court of Appeals ruled the State's interest was not "sufficiently important" to overcome the "heavy presumption in favor of parental decisions." 707 F.2d at 707. However, the 3-judge panel could not agree whether the State's action violated the *constitutional* rights of the parents. One judge found the State violated the parents' constitutional rights,[4] one judge concurred on nonconstitutional grounds,[5] and one judge dissented.[6] Thus the *Halderman* decision is of little value to this court.

Ms. Key's claims that her constitutional rights are violated are not borne out by the law.

Ms. Key does not assert that the dependency procedure is per se unconstitutional. Instead, she alleges only that declaring Kirsten dependent without a finding of parental unfitness violates Ms. Key's rights. In essence, Ms. Key asserts that the procedure by which a child can be found dependent without a finding of parental unfitness is unconstitutional.

This court has stated:

> [I]n assessing the constitutionality of a procedure which infringes upon parents' rights to the care, custody, and companionship of their children, it is necessary to ascertain the proper balance between the parents' constitutional rights and the State's constitutionally protected parens patriae interest in protecting the best interests of the child.

*In re Sumey*, 94 Wn.2d 757, 762-63, 621 P.2d 108 (1980). To achieve that balance, Washington courts apply a 3-prong

---

[4] Opinion of Aldisert, J.

[5] Opinion of Rosenn, J.

[6] Opinion of Sloviter, J.

test. The three factors the court considers are: (1) the parents' interests; (2) the risk of error created by the State's chosen procedure; and (3) the State's interest. *Krause*, 47 Wn. App. at 738; *see also Parham v. J.R.*, 442 U.S. 584, 599-600, 61 L. Ed. 2d 101, 99 S. Ct. 2493 (1979) (applying same 3-part test).

Addressing the three factors this court must consider as enumerated in *Krause v. Catholic Comm'ty Servs.*, *supra*, it is apparent first that the parents' interest is adequately protected by statutory procedural safeguards. *Krause*, 47 Wn. App. at 740. Due process requires that parents have notice, an opportunity to be heard, and the right to be represented by counsel. *In re Myricks*, 85 Wn.2d 252, 254, 533 P.2d 841 (1975); *In re Messmer*, 52 Wn.2d 510, 514, 326 P.2d 1004 (1958). The statute provides that the parent

> has a right to be represented by an attorney . . . to introduce evidence, to be heard in . . . her own behalf, to examine witnesses, to receive a decision based solely on the evidence adduced at the hearing, and to an unbiased fact-finder.

RCW 13.34.090. That statute fulfills all of the requirements of due process, and appellant does not claim the State did not comply with the statute in her case.

Ms. Key's interest is the same as that of any parent in a dependency proceeding. Her interest does not depend on whether she is found unfit. Instead, the presence or absence of unfitness would seem to affect only the weight of the State's interest. Therefore, Ms. Key's interests are adequately protected. Under RCW 13.34.260, she can veto a foster care placement unless the State carries its burden and shows by clear, cogent, and convincing proof that the placement is in the child's best interests.

In addition, as we have previously indicated, placing the burden upon the Department to show good cause by clear and convincing evidence why it should not follow the wishes of the natural parent regarding placement of the child provides additional safeguards of the parent's right.

The second *Krause* factor is the risk that the State's chosen procedure will result in wrongful deprivation of parental rights.

In order for a court to declare a child dependent, the court must find by a preponderance of the evidence that the child meets one of the statutory definitions of dependency. RCW 13.34.130. The Court of Appeals upheld the preponderance of the evidence standard against a due process challenge. *In re Chubb*, 46 Wn. App. 530, 731 P.2d 537 (1987). In so holding, the court applied the same 3-part test enunciated above. 46 Wn. App. at 536-37.

The court in *Chubb* cited three factors as supporting its conclusion that there is a minimal risk of error. First, the dependency determination is reviewable every 6 months. *See* RCW 13.34.130(5). Second, the dependency determination is reversible. Third, dependency cannot ripen into a termination of parental rights absent clear and convincing evidence sufficient to meet the requirements of RCW 13.34-.180. 46 Wn. App. at 536. Thus, the court concluded, there is a minimal risk of error. 46 Wn. App. at 536; *accord, Krause*, 47 Wn. App. at 740. A fourth factor present in this case is that the parent may terminate the dependency at any time inasmuch as it is a consensual proceeding under the applicable statute.

The last *Krause* factor, that of the State's interest, has been previously addressed. The fiscal penalties to this State, should it not follow the federal guidelines, are for legislative recognition and solution.

The appellant also assigns numerous errors to the lower court's findings of fact. She does not, however, cite any authority or provide any analysis or argument as to why she challenges those findings. We treat the assignments of error, therefore, as challenges to the sufficiency of the evidence and find that the evidence is more than adequate to support the trial court's findings.

Two of the social workers familiar with the case testified that Ms. Key could not take care of Kirsten in her home

without additional support. Ms. Key admitted that the foster mother is better able to care for Kirsten's physical needs. While Ms. Key did take care of Kirsten at one time, that was prior to the development of many of the medical problems Kirsten now faces. Ms. Key placed her daughter in foster care on at least three different occasions specifically because she could not provide for all of Kirsten's needs.

A third social worker and Kirsten's guardian ad litem both testified it was in Kirsten's best interest to stay in the foster home. Ms. Key testified that Kirsten needs the stability the foster home provides in order to be healthy. Due to that stability, Kirsten has gained weight and is healthier when she is in her foster mother's care.

There is substantial evidence to support the finding of dependency. The appellant's constitutional rights have been adequately protected. We affirm the opinion of the Benton County Superior Court.

DORE, C.J., and DOLLIVER, SMITH, GUY, and JOHNSON, JJ., concur.

DURHAM, J. (dissenting) — The dependency action in this case arose because the Department of Social and Health Services (Department) misinterpreted a federal funding statute. The Department thought that dependencies were necessary to maintain federal funds, when in fact, funding can easily be preserved through other means.

Recognizing the harshness of the Department's approach, the majority attempts to find other grounds for justifying dependency actions. First, it suggests that the parent here might have consented to the dependency. The record is clear: she did not. Second, the majority uncovers a statute relating to placement, and uses it to announce a new test for dependency determinations involving disabled children. As a result, serious due process and equal protection questions are raised. Ironically, it is now more difficult to remove non-

disabled children from abusive homes, than disabled children from loving homes. Accordingly, I dissent.

The majority's factual recitation is largely correct, but some important facts are omitted and others require clarification. On December 9, 1982, Kirsten Key was born to parents Kelly and Kim Key. Kirsten was born with her umbilical cord wrapped twice tightly around her neck which ultimately resulted in severe cerebral palsy with spastic quadriplegia, a condition which ensured severe, lifelong physical and mental problems. As a result, the doctors urged the Keys to place their daughter in an institution — "there were places for children like [Kirsten]".

For Kelly, however, institutionalization conflicted with her duty to love and care for her daughter's needs. To prepare for Kirsten's homecoming, Kelly learned how to care for handicapped children and received special training in CPR, heart monitors, and gavage feeding.[7] In late January 1983, Kelly was able to bring Kirsten home.

During the first 2 years of Kirsten's life, she required monthly trips to the doctor, weekly trips to physical therapists, and periodic emergency room visits. All of this was paid for through medical insurance provided by Kim Key's employer. Kelly stayed home to care for Kirsten, and by the age of 2½ months, had her daughter drinking from a bottle.

Unfortunately, however, the Keys' marriage was not able to withstand the stresses of caring for a handicapped child and the couple separated in the middle of 1985. For a short period of time, Kirsten continued to receive private medical insurance coverage, but then Kim quit his job. This left Kelly with no means of paying for Kirsten's extensive medical bills.

Determined not to go on welfare, Kelly sought other means of caring for her daughter's needs. For a few months, she was able to care for Kirsten by working nights while a friend baby-sat, but this solution was not a permanent one. Eventually, her friend could no longer baby-sit. Kelly next sought in-

---

[7]"Gavage feeding" entails placing a tube into the child's stomach and dropping milk into the tube with a syringe.

home nursing care from the State, to watch over Kirsten while Kelly worked. All the Department could offer was voluntary foster care, which Kelly vehemently opposed because she wanted her daughter to remain at home.

It soon became apparent, however, that foster care was her only option. In September 1985, after having depleted all her financial resources, Kelly was forced to place Kirsten in temporary foster care. The difficulty of her decision was evidenced by Kelly's testimony that she cried herself to sleep every night that her daughter was not at home. The placement lasted about 3 months. During this period, Kirsten faced several severe medical crises, including double pneumonia. Each time, despite the foster placement, Kelly was the one who admitted her daughter into the hospital, stayed with her, and directed her medical care.

Over the ensuing years, Kirsten's deteriorating condition and the accompanying financial burdens necessitated additional periodic foster care placements. On one occasion, foster care was required after the social security office abruptly cut off supplemental medical payments. Other times, Kelly used foster care as a means of child care while she worked at various jobs. In all cases, however, foster care was not her first choice, but her last resort.

Eventually, though, Kelly reached an accommodation with the Department. She conditioned Kirsten's foster placement on the availability of Mrs. Lawrence, a foster care provider who was also an old family friend. Kelly even went so far as to move next door to Mrs. Lawrence so that she could help with Kirsten's care. Through this arrangement, Kelly maintained the right to make basic decisions regarding Kirsten's well-being.[8] Clerk's Papers, at 43. Decisions regarding her

---

[8]The importance to Kelly of maintaining fundamental control over her daughter cannot be overstated. For example, on one occasion when Mrs. Lawrence was unavailable, Kelly allowed the Department to place Kirsten for 3 weeks with foster parents in Benton City, Washington. While visiting Kirsten at the foster home, Kelly noticed that Kirsten's hair had been cut and the end of her nose was burned. Even though Kirsten is not ambulatory, the foster mother claimed that Kirsten had burned herself by coming too close to the fireplace. Concerned for her daughter and acting on her own initiative, Kelly immediately terminated the foster placement. Kirsten did not return to foster care until Mrs. Lawrence again became available.

daughter's medical care, education and comfort remained within Kelly's ultimate discretion.

This compromise between Kelly and the State ended on January 22, 1990, when the Department served her with the dependency petition which forms the basis for this action.[9] The dependency was not motivated by any belief that Kelly was an unfit mother — to the contrary, all parties agree that she is an exceptional mother. Nor was the dependency designed to serve Kirsten's best interests. The only reason for removing this child from the care and control of her mother was to comply with the Department's erroneous interpretation of a routine federal funding statute — a sad excuse for separating mother and daughter.

STATUTORY AUTHORITY

Under Washington law, a child can be declared a dependent of the State whenever one of four dependency definitions is satisfied. *See* RCW 13.34.030(2)(a)-(d). Kirsten was found dependent *solely* under the terms of the statute's handicapped child provision, RCW 13.34.030(2)(d), which defines a "dependent child" as one:

> Who has a developmental disability . . . *and* whose parent, guardian, or legal custodian *together with* the department *determines that services appropriate to the child's needs can not be provided in the home.*

(Italics mine.) Under the plain language of this statute, a finding of dependency is appropriate only when the parent *together with* the Department determines that the child's needs cannot be met in the home. This language envisions a consensual determination by both the parent and the Department; a dependency cannot result where one party thrusts its will upon the other.

---

[9]Unlike voluntary foster care, where the purpose is to provide parents aid in caring for the proper needs of a child, *see* RCW 74.13.010; RCW 74.13.020, a dependency action is designed to temporarily remove the child from a parent's authority. A dependency typically lasts for a minimum period of 6 months, and may result in a permanent termination of the parental relationship. *See* RCW 13.34.130; RCW 13.34.180.

The majority misapplies this statute. Nothing in the record supports a consensual agreement. Although the majority characterizes Kelly's views of the dependency proceeding as a "difficult question", her position could not be more clear. From the outset, Kelly explicitly objected to the dependency with all the force she could bring to bear.[10] She continues to fight it to this day. Moreover, Kelly has never agreed that she was unable to care for her daughter. As the majority admits, Kelly "testified she is fully capable of caring for Kirsten's psychological and physical needs." Majority, at 605. Maintenance of her parental authority, despite the challenges of Kirsten's disabilities, has been Kelly's goal from the beginning.

Furthermore, without explanation, the majority relies upon a statute which is irrelevant to the dependency determination. Finding no support in RCW 13.34.030(2)(d), it claims that its finding of dependency is justified by RCW 13.34.130(1)(b)(iv), the statute governing disposition orders. The majority holds that a dependency for handicapped children is appropriate whenever "the 'parent . . . has determined that the child would benefit from placement outside of the home.' " Majority, at 606 (quoting RCW 13.34.130(1)-(b)(iv)).

I cannot emphasize this point strongly enough: the language in RCW 13.34.130(1)(b)(iv) has *nothing* to do with an initial finding of dependency. RCW 13.34.130(1)(b)(iv) applies only "*after* . . . it has been proven by a preponderance of the evidence that the child is dependent within the meaning of RCW 13.34.030(2)". (Italics mine.) RCW 13.34.130. The dis-

---

[10]Realizing that Kelly would never consent to a dependency, the Department also claimed that Kirsten was dependent because she "has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development". RCW 13.34.030(2)(c). This contention was added despite a lack of supporting evidence. It was specifically rejected by the trial court after a State's witness admitted that it was *fabricated*, and added only because the Department knew Kelly would never consent to an RCW 13.34-.030(2)(d) dependency. Report of Proceedings, at 72-73.

position statute cannot be used to modify the specific language of the statute governing the initial dependency finding. In essence, the majority would have us pass through the door without ever having crossed the threshold.

Moreover, the test proposed by the majority is far too vague. It would allow a dependency to be declared every time a child might benefit — whatever that means — from placement outside the home. This is a careless measurement which is destined for abuse. For working parents in particular, few would dispute that day-care workers are "more capable" of caring for children during the workday. Such a reasoned approach to child care should not leave parents vulnerable to dependency actions. It runs contrary to public policy to punish those parents who provide for a child's care by seeking the help of others.

The majority's interpretation of federal funding requirements is equally flawed. Simply put, review of foster placements by the juvenile courts is not necessary to maintain federal funding. Federal law mandates only that a foster placement be subject to *periodic review by the courts or an administrative body.* 42 U.S.C. § 675(5)(B). The State has no particular interest in court review as opposed to administrative review since either option preserves federal funding. *See* RCW 13.70 (establishes a limited administrative review board system).

Even if the State does prefer court review, a finding of dependency is not necessary to achieve this purpose. The dependency statute itself, specifically RCW 13.34.145(1), can be interpreted broadly enough to allow review of voluntary foster placements without a prior finding of dependency. Not only is this approach consistent with the juvenile jurisdiction statute itself, it represents a far less intrusive method of preserving federal funding.

### FOURTEENTH AMENDMENT

The majority's statutory interpretation creates constitutional conflict where none existed before. One result of the majority's reasoning surely could not have been intended.

Now, the State can more easily prove a dependency involving disabled children than a dependency involving non-disabled children. For non-disabled children the State faces the difficult task of proving some type of parental unfitness or other serious risk to the child. *See* RCW 13.34.030(2)(a)-(c). But according to the majority, disabled children can be declared dependent whenever the State shows that the child "would benefit" from placement outside the home.

The Fourteenth Amendment does not allow this result. Under equal protection analysis, Kelly cannot be more readily deprived of her parental rights simply because she is the mother of a disabled child. A deprivation of fundamental rights can only be justified where the law is narrowly tailored to serve a compelling state interest. *Kramer v. Union Free Sch. Dist. 15*, 395 U.S. 621, 632, 23 L. Ed. 2d 583, 89 S. Ct. 1886 (1969). Here, the majority advances an interpretation of the statute which creates a double standard for disabled and non-disabled involuntary dependency actions. No state interest is identified to justify this discriminatory treatment.

The majority interpretation of RCW 13.34.030(2)(d) also conflicts with substantive due process by allowing Kirsten to be declared dependent without Kelly's consent and absent any finding of parental unfitness.[11] *See* U.S. Const. amend. 14. As this court has consistently recognized, "[t]he liberty and privacy protections of the due process clause of the Fourteenth Amendment establish a parental constitutional right to the care, custody, and companionship of the child." (Citations omitted.) *In re Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980). Parental rights are some of the most fundamental known to our society. *Stanley v. Illinois*, 405 U.S. 645, 651, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (1972); *Franz v. United States*, 707 F.2d 582, 602 (D.C. Cir. 1983). As such, restrictions can be supported only if they further compelling state interests, and are narrowly drawn to serve

---

[11]Although raised by appellant, the majority ignores this deprivation of a substantive constitutional right, and instead applies a procedural due process analysis not raised by either party.

those interests. *State v. Farmer*, 116 Wn.2d 414, 429, 805 P.2d 200, 812 P.2d 858 (1991); *In re Schuoler*, 106 Wn.2d 500, 508, 723 P.2d 1103 (1986).

The majority does not deny the fundamental nature of parental rights, but rather discounts the impact of a dependency finding on those rights and invents special dependency statute procedures for "concerned parent[s], such as Ms. Key". Majority, at 607. None of its efforts are persuasive. No authority exists for the majority's proposition that dependency orders entered with the consent or agreement of the parties may be terminated by a parent, at any time, upon the withdrawal of consent.[12] Majority, at 612. Likewise, the majority's assertion that a "dependency hearing is 'a preliminary, remedial, nonadversary proceeding' that does not permanently deprive a parent of any rights", majority at 609, ignores past cases where we have emphasized the significant effects of a dependency hearing on parental rights. *See, e.g., In re Sumey*, 94 Wn.2d at 763; *In re Myricks*, 85 Wn.2d 252, 254-55, 533 P.2d 841 (1975); *In re Luscier*, 84 Wn.2d 135, 524 P.2d 906 (1974).

Even less successful is the majority's attempt to minimize the impact of dependency by labeling it merely a nonpermanent deprivation of rights. Majority, at 609. "[W]here the potential consequence is termination of parental rights on a *temporary or permanent basis*, the ultimate nature of the abridgement of parental constitutional rights necessitates an extremely substantial justification." (Italics mine.) *In re Sumey*, 94 Wn.2d at 763; *see also In re Myricks, supra* at 254-55. Furthermore, no comfort can be found in the majority's characterization of RCW 13.34.030(2)(d) as merely a jurisdictional statute. Majority, at 607-08. Dependency is not some jurisdictional artifact, but a state-enforced diminishment of the substantive legal relationship between a parent

---

[12]In fact, this holding is directly contrary to specific statutory safeguards which require a court order to terminate a dependency, and mandate periodic court review following the termination. RCW 13.34.130(5)(a).

and child. Regardless of the reason for the dependency, parents lose the right to make ultimate decisions determining the care, education and housing of a dependent child.[13] *See* RCW 13.34.130(1); *In re Sumey*, 94 Wn.2d 757, 763, 621 P.2d 108 (1980).

Given the significant impact of the dependency on Kelly's parental rights, the State can prevail only if it can demonstrate a narrowly tailored, compelling state interest. The majority identifies two state interests to support the necessity of a dependency finding: the desire to maintain federal funding, and the parens patriae interest.

According to the majority, the fiscal state interest can be divined from "the complex labyrinth of federal funding regulations" which require periodic review of foster placements as a condition of federal funding. Majority, at 607-08. The road to dependency from here is a serendipitous one: (1) to retain funding, foster placements must be reviewed by either an administrative body or a court, (2) Washington decided to do this via the courts, and therefore, (3) the "only way" the juvenile court can exercise its legislatively required review of foster children is to initiate a dependency action. Majority, at 608. The majority labels the State's supposed decision to review placements through dependency actions a "reasonable choice". Majority, at 608-09. Unfortunately, this choice is neither reasonable, correct, nor compelling. As discussed above, funding regulations do not require such an anomalous process.

---

[13]The majority interprets RCW 13.34.260 to allow a change in Kirsten's placement against Kelly's wishes only where the Department proves by *clear, cogent and convincing evidence* that its proposed placement is in the "best welfare of the child". Majority, at 602-03, 607. No authority is cited for this statement. The statute itself states only that parental authority is "appropriate" and "should be integrated through the foster care team." RCW 13.34.260. The majority interpretation effectively overrules *In re Eaton*, 110 Wn.2d 892, 757 P.2d 961 (1988), *In re Lowe*, 89 Wn.2d 824, 576 P.2d 65 (1978), and *In re Gakin*, 22 Wn. App. 822, 592 P.2d 670 (1979), which held that a juvenile court may not order treatment of a child in a specific placement.

As a fall-back position, the majority suggests that the State's action in finding Kirsten dependent without any showing of parental unfitness is supported by its parens patriae interest.[14] In evaluating this interest, it cannot be overemphasized that the lower court did not challenge Kelly's fitness as a parent. Without a finding of unfitness or some other serious risk to the child, the State's parens patriae interest does not even come into play. *Santosky v. Kramer*, 455 U.S. 745, 767 n.17, 71 L. Ed. 2d 599, 102 S. Ct. 1388 (1982). Instead, the interest cuts the opposite way. As the Supreme Court stated in *Santosky*, "while there is still reason to believe that positive, nurturing parent-child relationships exist, the *parens patriae* interest favors preservation, not severance, of natural familial bonds." 455 U.S. at 766-67; *accord, Stanley*, 405 U.S. at 652-53. When a parent is fit, the parent's interest is "cognizable and substantial", and "[t]he State's interest in caring for [that parent's] children is *de minimis*". *Stanley*, at 651-52, 657; *accord, Quilloin v. Walcott*, 434 U.S. 246, 248, 54 L. Ed. 2d 511, 98 S. Ct. 549 (1978).

In sum, the integrity of the family unit is held in high regard by both statutory and constitutional jurisprudence. By treating dependency like a routine, momentary inconvenience in the process of parenting, the majority neglects, and thereby denigrates one of our most fundamental values. Even worse, it does so in a way that misconstrues the statute, discriminates against disabled children, and violates parental rights. I would, therefore, reverse the trial court's finding of dependency.

BRACHTENBACH and ANDERSEN, JJ., concur with DURHAM, J.

---

[14]It is unclear exactly how this state interest is implicated. The trial court found only that Kirsten's best interests were served by continuing the *foster placement*, not the dependency. See Clerk's Papers, at 8.