[Nos. 16537-6-II; 16629-1-II;   Division Two.   September 20, 1994.]
16630-5-II.

*In the Matter of the Dependency of* K.R., ET AL.

*Ronald D. Heslop* and *Ross E. Taylor,* for appellants (appointed counsel for appeal).

*Christine O. Gregoire, Attorney General,* and *Laurie A. Jinkins, Assistant,* for respondent.

HOUGHTON, J. — Patsy and Steven Jones, husband and wife, appeal from an order terminating their parental rights. They argue that the trial court erred in making a finding of sexual abuse based upon res judicata, and in admitting polygraph examiners' testimony. They also argue there was insufficient evidence to support some of the trial court's findings of fact. We reverse and remand for a new trial.

## FACTS

Patsy and Steven Jones are the parents of RJ, born March 7, 1988. Patsy Jones and Ralph Rogers are the parents of KR, born March 12, 1983. Patsy and Steven Jones appeal from a trial court order terminating their parental rights in their daughter, RJ. Patsy Jones appeals from an order terminating her parental rights in her daughter KR.

## BACKGROUND

In April 1989, KR apparently developed a rash in her groin area and stomach. At the termination hearing, Steven Jones' mother, Pearl Hopen, testified that she took Patsy Jones and KR to Puget Sound Hospital's emergency room for an examination of the rash. KR was diagnosed as having strep throat and scarlet fever. Hopen further testified that the doctor prescribed an antibiotic lotion for application to KR's groin area and other areas where the rash appeared. Patsy Jones was instructed to check KR's groin area for infections.

Patsy Jones was also instructed to wash KR's groin carefully and keep it extremely clean because she could develop a vaginal infection from the scarlet fever. KR testified that both she and her mother applied the cream medication to her groin area when she had the rash. Patsy Jones acknowledged that she touched KR's groin during the illness.

On September 23, 1989, Patsy Jones and her daughters were living with Dawn Emberly, a former neighbor. Emberly testified that she was up late listening to her boyfriend and Patsy Jones, who were downstairs together, because she was suspicious and jealous of Jones. She heard Jones turn off the television and go upstairs to the bedroom where KR and RJ were sleeping. This bedroom was about 20 feet away from Emberly's room. All the bedroom doorways were open.

Emberly testified she then heard KR say: "No, I don't want to, I am tired", and "Mommy, it hurts, don't hurt me, mommy." Emberly further testified that KR's statements continued for about 2 hours, during which time the baby, RJ, was awakened by KR's statements. Patsy Jones became angry and told KR to be quiet. Emberly also testified that KR later said, "No, I promise I won't, I won't mommy." Emberly's impression was that Jones was sexually touching KR. Emberly testified that she did not remember KR having a rash from scarlet fever, or receiving treatments.

The following day, Emberly discussed this incident with her brother-in-law. They determined to set up a tape recorder outside the bedroom, with the object of taping a similar incident. Emberly testified that Jones discovered the tape recorder and turned it off, although they never discussed its presence or the incident.

Over 1 month later, October 25, 1989, Emberly contacted Child Protective Services (CPS) concerning this incident, asking that her name not be revealed. After the referral, Linda Scott, a CPS social worker, interviewed KR in the principal's office at her school. During this interview KR stated, "My mommy checks if I have poison to see if I got hurt down there. It kind of hurts but not too much. She spreads it out a little and not down in, just checked on

outside. " KR told Scott that her mother did this at night, about once a week, and that she also used to do it to RJ, but not anymore, because RJ cried. According to Scott, KR denied that anyone else checked her for poison or touched her private parts.

Scott contacted the Tacoma Police Department. KR and RJ were taken into protective custody. Patsy Jones denied the allegations, but agreed to sign a voluntary consent for placement of the children with Emberly. KR and RJ were eventually removed from Emberly's care and placed in a foster home.

## DEPENDENCY HEARING

On April 12, 1990, Scott filed dependency petitions regarding KR and RJ. An order of default was entered against KR's natural father, Ralph Rogers, who failed to appear or defend against the dependency petition. On July 6, 1990, Steven Jones agreed to a finding of dependency regarding RJ.

On July 5 and 6, 1990, a contested dependency hearing was held concerning Patsy Jones. The trial court entered an Order of Dependency, finding that certain allegations in the dependency petitions were true or undisputed. The allegations from the dependency petitions essentially state the above noted circumstances. In addition, they allege that (1) KR said her mommy told her not to tell anyone about mommy checking her for poisons; (2) KR said it hurts sometimes when mommy checks her; (3) a physical examination of KR showed evidence consistent with possible sexual abuse and penetration; (4) Michael Comte, a social worker whose office performed a psychological evaluation of Patsy Jones, concluded that there was substance to the allegations and that Jones posed a risk to her children's safety and well-being; (5) Patsy Jones continued to deny the allegation of sexual abuse and would not cooperate with recommended sex offender treatment; and (6) reasonable efforts to prevent out-of-home placement were not provided due to the emergent nature of the situation and the risk to the child.

On September 21, 1990, dependency hearing dispositional orders were filed. Patsy Jones was ordered to participate in a drug/alcohol evaluation and followup; attend and complete an anger management program; and participate in counseling focusing on sex offender issues and issues identified in a psychological evaluation, with therapy specifically directed toward sex offending. Steven Jones was ordered to participate in drug/alcohol evaluation and followup, and complete a psychological evaluation and followup. He was granted weekly supervised visitation with the children.

Following the initial finding of dependency, review hearings were held on October 15, 1990, April 8, 1991, July 23, 1991, September 30, 1991, and April 6, 1992. At each review hearing, the court found that KR and RJ remained dependent pursuant to RCW 13.34.030(2)(b) and (c). Most of the dependency review orders noted that the supervising agency was dissatisfied with the Jones' progress in participating in the services ordered by the court.

## CRIMINAL CHARGES AGAINST PATSY JONES

On July 26, 1990, criminal charges were brought against Patsy Jones. After the charges were filed, Patsy Jones' visitation privileges were terminated. At that time, Ray Marriott, a social worker responsible for permanency planning, made some suggestions to Patsy and Steven Jones about services they needed. He later advised Patsy Jones that she might defer some of the social services ordered at the fact-finding hearing until her criminal case was resolved. The criminal charges were dismissed in March 1991, due to the lack of a speedy trial. Patsy Jones' visitation privileges, however, were never reinstated.

## TERMINATION HEARING

On September 25, 1991, Bruce Witham, the CPS social worker assigned to the case, filed petitions to terminate the parental rights of Patsy and Steven Jones as to both KR and RJ.[1] A termination hearing was then held from June 15

---

[1]On March 10, 1992, 3 months before the termination hearing, Patsy and Steven Jones removed KR and RJ from their foster home in the middle of the

through June 24, 1992. The court heard testimony from a number of witnesses, including psychologists and other treatment providers, polygraph examiners, social workers, Steven Jones, his mother, and KR.

## A
### Psychological Evaluations

At the termination hearing, there was testimony that CPS had referred Patsy Jones to Michael Comte, MSW, ACSW, a specialist in sexual offender evaluation and treatment. He ordered a battery of psychological tests on Patsy Jones, which were then interpreted by Comte's consulting psychologist. Comte's general practice is to allow the psychologist to interpret the tests without benefit of the background or specifics of the charges against the person tested. Comte then incorporates the psychologist's recommendations and conclusions into his own documentation.

Comte testified that he initially reviewed a written report of findings and conclusions prepared by the consulting psychologist. He then interviewed Patsy Jones for 2 hours. The following day, he had a telephone communication with Linda Scott and Pearl Hopen. Comte also reviewed the referral letter from Scott, and the report from KR's medical examination in the Sexual Assault Clinic at Mary Bridge Children's Health Center. Thereafter, Comte referred Patsy Jones to polygraph examiner Richard Peregrin, who administered a polygraph test in conjunction with Comte's evaluation.

Based upon these evaluations, Comte testified at the termination hearing that he believed Patsy Jones sexually molested KR and that she was in desperate need of psychological therapy to address problems identified in his evaluation. Comte also testified that Patsy Jones posed a danger to the safety and well-being of her children. He concluded that her prognosis was dismal because she could not be treated for sexual deviation as long as she stayed in denial.

night. They took the children to Disneyland and Seaworld in California, and then into Mexico. The family was located on March 17, 1992, returning from Mexico to the United States. Both Patsy and Steven Jones pleaded guilty to custodial interference. After this incident, Steven Jones' visitation privileges were also terminated.

Patsy Jones presented the testimony of Thomas Clifford, Ph.D., who extensively examined Jones. In a September 1991 letter, Washington State Department of Social and Health Services (DSHS) expressed its support for these examinations and authorized payment for 8 hours of sexual deviancy treatment and assessment. Dr. Clifford first saw Patsy Jones on August 6, 1991; he spent a total of 25 hours over several sessions with her.

In addition to these sessions, in forming his opinion Dr. Clifford reviewed the following documents:

1. KR's April 4, 1989, emergency department record from Puget Sound Hospital;

2. Fourteen pages of reports from about October 25, 1989, involving allegations of child abuse and neglect by Patsy Jones;

3. Patsy Jones' mother's November 25, 1989, 8-page statement;

4. 1989 and 1990 reports of child victim interviews with KR, and with Emberly's two children;

5. Drs. Duralde's and Scherz's colposcopy reports of KR, RJ, and Emberly's two children;

6. Patsy Jones' June 1990 affidavit of probable cause and informational entry, alleging two counts of first degree child molestation and one count of first degree child rape;

7. Patsy Jones' February 1991 certificate from Lakeside Recovery Centers;

8. Patsy Jones' March 7, 1991, discharge report from Pierce County Alliance;

9. CPS's April 12, 1990, dependency petition and motion for custody order for KR;

10. DSHS's May 21 and July 26, 1990, and March 29, 1991, periodic review reports;

11. DSHS's May 29, 1991, reports from an apparent staff review;

12. Birohnie Dowdell's July 5, 1991, letter to Bruce Witham;

13. Guardian ad litem's July 23, 1991, report to the court;

14. Comte's February 7, 1990, evaluation, along with psychological test data administered by Richard Washburn, Ph.D.;

15. Vince Young's (counselor, Comprehensive Mental Health) September 1990 to January 1991 screening reports;

16. KR's 113 pages of documents from Campbell County School District of Gillette, Wyoming;

17. Birohnie Dowdell's telephone discussions with Ruth Currah; and

18. Patsy Jones' October 29 and November 5, 1991, polygraph examination results.

Based upon his evaluations and these documents, Dr. Clifford testified that Patsy Jones denied abusing her children and that, considering all the information available to him, he found no evidence indicating that she had abused her children. Dr. Clifford also recommended that Patsy Jones be allowed supervised visitation with her children.

## B

## Polygraph Testimony

Richard Peregrin, who administered Patsy Jones' initial polygraph test in conjunction with Comte's psychological evaluation, testified that the polygraph showed Patsy Jones was being deceptive in response to questions regarding sexual touching of KR. Dr. Clifford referred Patsy Jones to John Ketchum for a second opinion.

Ketchum administered three polygraph examinations. He testified that the results of his first examination showed a passing response (*i.e.*, no deception) to a question regarding whether Jones spread open KR's vagina for pleasure. He also noted an inconclusive response to whether she spread open KR's vagina for hygienic purposes. In the third polygraph examination, in response to questions regarding whether she ever spread open or penetrated KR's vagina for pleasure, Jones' denials showed no deception.

## C
### Court-Ordered Services

Patsy Jones successfully completed the court-ordered drug/alcohol evaluation and followup in February 1991. In March 1991, CPS referred her to Birohnie Dowdell, an alcoholism, drug addiction, and anger management counselor. Dowdell testified that Patsy Jones completed the 12-week course in anger management. She further testified that it would be very appropriate for Patsy Jones to visit with her children.

From November 1990 through January 1991, Witham attempted to find a treatment provider who dealt with female alleged sex offenders. In January 1991, Patsy Jones was referred to Dr. Ruth Currah, a mental health therapist and sex offender treatment provider. Patsy Jones began sex offender treatment with Dr. Currah in May 1991.

Dr. Currah testified that, after 9 months of therapy, she had concluded Patsy Jones did not abuse KR. In Dr. Currah's opinion, Patsy Jones was not a risk to KR, and the children should be returned to her. Although Witham testified that he was not pleased Dr. Currah had been chosen for the sex offender treatment, he could not recall discussing his displeasure with either Patsy Jones or Dr. Currah. Witham never requested any reports from Dr. Currah.

Steven Jones participated in a drug/alcohol evaluation and followup, but was eventually terminated from the program after two positive findings of marijuana on urinalysis, followed by a failure to meet appointments. In May 1991, Steven Jones was again referred to substance abuse counselor Venita Able, and evaluated for reinstatement into the program. Able testified that she recommended he complete a 21-day inpatient program and followup with a 1- to 2-year active care program, which Steven Jones did not enter.

Steven Jones was evaluated by Dr. Clifford. Jones acknowledged that he neither knew of nor followed up on the recommendations Dr. Clifford made in his report, because he failed to pay for the psychological evaluation. He testified that he sought financial assistance from the State to pay for Dr.

Clifford's evaluation; however, Witham testified that Steven Jones volunteered to pay for the evaluation. Witham also testified that he recommended a reduction of Jones' visitation to once per month because of inadequate attendance at weekly visitations, sporadic employment, and constant moves.

## D
### Other Testimony

KR testified that Emberly's daughter, ME, touched her private parts on two separate occasions 3 years prior — once by sticking a doll's leg into her, and once by doing the same thing with a crayon.

Steven Jones testified that he did not believe Patsy Jones had sexually molested KR and RJ.

### TERMINATION COURTS RULING

On June 24, 1992, the trial court in the termination proceeding (termination court) made an oral ruling terminating the parental rights of Patsy and Steven Jones. Later, the termination court entered the following findings of fact regarding sexual molestation:

> KR was sexually molested by Patsy Jones on or about 10/25/89. This finding is based on res judicata. Findings and dispositional order 9/21/90 are included and attached.

Finding of fact 5.

> The Court declined to make findings on the events of 10/25/89 other than res judicata.

Finding of fact 5A. Orders of termination of parental rights as to both children were entered on September 30, 1992.

### ANALYSIS

Patsy and Steven Jones contend that (1) the termination court erred in determining that the sexual abuse found by the trial court in the dependency proceeding (dependency court) was res judicata in the termination proceeding; (2) the evidence was insufficient to support some of the termination court's findings of fact and conclusions of law; and (3) the

termination court erred in admitting the polygraph testimony. We address these issues seriatim.

## A
### Res Judicata and the Need for Present Findings at the Termination Proceeding

■ Dependency and termination proceedings have different objectives, statutory requirements, and safeguards. *In re Key*, 119 Wn.2d 600, 609, 836 P.2d 200 (1992), *cert. denied*, 113 S. Ct. 1302 (1993). "The key difference in the dependency hearing is 'a preliminary, remedial, nonadversary proceeding' that does not permanently deprive a parent of any rights." *Key*, at 609 (quoting *In re A. W.*, 53 Wn. App. 22, 30, 765 P.2d 307 (1988), *review denied*, 112 Wn.2d 1017 (1989)). Thus, a finding of dependency does not inevitably lead to a termination of parental rights. *In re Key, supra.*

■ In a dependency hearing, prior to entry of an order of disposition under RCW 13.34.130, the State must establish that the child is dependent under RCW 13.34.030(2), by a preponderance of the evidence. Under the latter statute, "dependent child" includes any child who is abused or neglected (as defined in RCW 26.44.020) by a person legally responsible for the care of the child. RCW 13.34.030(2)(b). Such dependency proceedings are designed to protect children, to help parents alleviate problems, and, where appropriate, to reunite families. *See, e.g., A. W.*, 53 Wn. App. at 27; RCW 13.34.020.

By contrast, under the statute allowing termination of the parent-child relationship, RCW 13.34.190(1), the termination court must find that termination is in the child's best interests and that the following six allegations in RCW 13.34.180 are established:

(1) That the child has been found to be a dependent child under RCW 13.34.030(2); and

(2) That the court has entered a dispositional order pursuant to RCW 13.34.130; and

(3) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency under RCW 13.34.030(2); and

(4) That the services ordered under RCW 13.34.130 have been offered or provided and all necessary services, reasonably

available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided; and

(5) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future; and

(6) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home[.]

RCW 13.34.180(1)-(6). These elements must be established by clear, cogent, and convincing evidence. *Krause v. Catholic Comm'ty Servs.*, 47 Wn. App. 734, 740, 737 P.2d 280, *review denied*, 108 Wn.2d 1035 (1987); *In re Churape*, 43 Wn. App. 634, 638-39, 719 P.2d 127 (1986); *see also Santosky v. Kramer*, 455 U.S. 745, 747-48, 71 L. Ed. 2d 599, 102 S. Ct. 1388 (1982).

Although the dependency court did not make a specific finding that Patsy Jones had abused KR, the termination court nevertheless made a "finding" based upon res judicata (or, more appropriately in this case, collateral estoppel or issue preclusion) that KR was sexually molested by Patsy Jones on or about October 25, 1989. The termination court apparently determined that this "finding" followed from the dependency court's discussion of danger to the child and classification of the mother as an offender in its dispositional order. The court also determined issue preclusion was appropriate because, during or after the dependency proceedings, (1) the dependency court heard the issues on fresh evidence; (2) the parties could have moved for reconsideration of the dependency court's findings; and (3) the parties had the right to appeal.

■■ A basic problem in this case is that a trial court cannot make findings of fact "based on res judicata", as the trial court here purported to do. A trial court that applies res judicata is, by definition, precluded from litigating the facts. This is true, of course, because the same facts have already been litigated in a prior proceeding. Thus, a trial court that makes findings is not applying res judicata, and a trial court applying res judicata is not making findings of its own.

■ The Joneses contend that it was error for the termination court to deem itself bound by the findings of the

dependency court, and for the termination court not to make findings of its own. We agree for two independent reasons. First, res judicata cannot operate when the burden of persuasion in the prior proceeding was lower than the burden of persuasion in the present proceeding. *Standlee v. Smith*, 83 Wn.2d 405, 407, 518 P.2d 721 (1974). As noted-above, the burden of persuasion in a dependency hearing is preponderance of the evidence, while the burden of persuasion in a termination hearing is clear, cogent and convincing evidence. Thus, res judicata does not require or permit a termination court to adhere to the findings of a dependency court in lieu of making findings of its own.

Second, the above-noted statutes governing termination require the termination court to determine parental unfitness as of the time of the termination hearing:

> The Washington parental rights termination statutes require clear, cogent and convincing evidence of not only a prior determination that the parent has fallen below minimal standards, RCW 13.34.180(1), but of the fact that parental deficiencies still exist which are not likely to be remedied so that the child can be returned to the parent in the near future, RCW 13.34.180(5). The termination decision must be predicated upon *present parental unfitness*.

(Citation omitted. Italics ours.) *Krause*, 47 Wn. App. at 742. A termination court fails to perform this duty if it merely adopts findings made months or years earlier by a dependency court.

In the present case, the termination court erroneously applied res judicata. It also failed to determine whether Patsy Jones was an unfit parent at the time of the termination hearing. Each error caused the court's findings not to support its conclusions, and each error necessitates a new trial.

## B

### Insufficiency of Findings and Conclusions and the Polygraph Issue

Patsy and Steven Jones also contend many of the termination court's findings and conclusions are conclusory, insufficient to support termination, and unsupported by substan-

tial evidence. They further contend the polygraph testimony was inappropriately admitted. While we need not address these issues because we are remanding for a new trial, the following is intended to provide guidance to the trial court on remand.

### 1. *Patsy Jones.*

With regard to factor 5 of RCW 13.34.180, the termination court found that Patsy Jones failed to comply with services ordered pursuant to the dependency order. The record reveals, however, that she completed or was presently participating in court-ordered services. The State argues that because Patsy Jones refused to admit the abuse and was "in denial", it was impossible for her to participate in satisfactory sex offender treatment. Although this argument is supported by Comte's testimony, it does not answer the question as to whether Patsy Jones is now an abusive parent. In other words, the State must show the current existence of an adverse condition, and further that there is little likelihood that this condition can be remedied. We note that in RCW 13.34.180, element (4) is controlled by element (5). Therefore, if Patsy Jones is found currently prone to abuse her children, then the court may use her denials against her; if not, the court may not do so.

Thus, we find an unanswered issue of fact regarding whether Patsy Jones is currently prone to commit sexual abuse, and take no position regarding the adequacy of the evidence to support such a finding under the clear, cogent and convincing standard.

### 2. *Steven Jones.*

Although Steven Jones did not complete all court-ordered services, the record reveals that his parental rights were initially called into question primarily on the basis of allegations that he failed to protect RJ from Patsy Jones. The record contains no evidence, however, that Patsy Jones abused RJ. Nor is there any evidence of Steven Jones' current parental deficiencies.

Therefore, if the petition against Patsy Jones due to her alleged current propensity to abuse is dismissed, then the

petition against Steven Jones must also be dismissed, because the only allegation against him is failure to protect RJ from Patsy Jones. On the other hand, if the petition against Patsy Jones is granted, then the termination court must also determine whether Steven Jones will continue to expose the children to her in such a way as to put the children in danger. Unless he will, his parental rights may not be terminated.

### 3. *Polygraph Testimony.*

■ Finally, Patsy and Steven Jones contend the trial court erred in admitting the polygraph examiners' testimony. In Washington, polygraph testimony is inadmissible absent a written stipulation by both parties. *State v. Woo*, 84 Wn.2d 472, 473, 527 P.2d 271 (1974); *accord State v. Renfro*, 96 Wn.2d 902, 905, 639 P.2d 737, *cert. denied*, 459 U.S. 842 (1982). Therefore, on retrial, admission of the polygraph testimony will depend upon whether or not there is a written stipulation.

The termination order is reversed and the matter is remanded for a new trial. Pending such trial, dependency review proceedings should be held every 6 months, in accordance with RCW 13.34.130(5).

MORGAN, C.J., and SEINFELD, J., concur.

Reconsideration denied October 21, 1994.

Review granted at 125 Wn.2d 1019 (1995).