[No. 24444-6-II. Division Two. August 18, 2000.]

*In the Matter of the Placement of* R.J.

*Christine O. Gregoire, Attorney General,* and *Joann Sabol* and *Kenneth L. Lederman, Assistants,* for appellant.

*Margaret E. Baran,* for respondent.

*Sherrie Modun,* pro se.

ARMSTRONG, C.J. — R.J. is a developmentally disabled child. His mother voluntarily placed him with the Department of Social and Health Services (DSHS) for foster care under chapter 74.13 RCW. An agreement for voluntary placement authorizes DSHS to place the child in a foster home or group care facility. Such an agreement can be terminated by either the parents or DSHS at any time. At a review hearing the juvenile court ordered DSHS to place then 10-year-old R.J. at the Frances Haddon Morgan Center. DSHS argued that the Morgan Center was neither a foster home nor a group care facility. The court also ordered that R.J. remain at the Morgan Center even if DSHS revoked the voluntary placement agreement. On appeal, DSHS contends that the court lacked statutory authority to order the specific placement at the Morgan Center. We agree and, accordingly, reverse.

R.J. has a rare chromosomal disorder caused by deletion of the 11th chromosome. In addition to this developmental disability, he is legally blind, has high blood pressure and has lost a kidney to cancer. R.J. has behavior disorders and has the mental age of a three- to five-year-old. Because of R.J.'s problems, his mother turned to the State for help.

R.J.'s mother first asked DSHS for respite care. By June 1998, she had become so exhausted caring for R.J. that she asked DSHS to place him in a foster home. In October 1998, R.J.'s mother signed a voluntary placement agreement, allowing DSHS to provide foster care. R.J. was then hospitalized from mid-October to late December for medical management and behavior issues. When R.J. was released, DSHS placed him with a foster family who soon "burned out." Other foster homes also did not work out. For several weeks, R.J. spent one day with his mother and two days in three different foster homes. R.J. also stayed one night in a hotel with his care provider and other nights in an adult crisis triage center.

In search of a more stable placement for her son, R.J.'s mother and his therapist toured the Morgan Center, a state residential habilitation center for persons with developmental disabilities. Although the DSHS social workers had told R.J.'s mother that this facility was not an option, she asked that he be placed at the Morgan Center. R.J.'s guardian ad litem and his nurse joined in the mother's request.

At a juvenile court hearing on March 4, 1999, R.J.'s guardian ad litem asked that the court order DSHS to place R.J. at the Morgan Center.[1] DSHS argued that the Morgan Center was not a proper facility for R.J. because it did not admit children under the age of 13. DSHS was unable to suggest a currently available home or facility, and R.J.'s care provider did not know where he would stay after the weekend. The juvenile court ordered DSHS to place R.J. at the Morgan Center for a 30-day evaluation. And the order stated that R.J. would remain at the Morgan Center for 30 days, "even if the Department revokes the voluntary placement agreement with the mother pursuant to RCW 13.34.270."

The original order was followed by orders in April and June 1999 continuing R.J.'s placement at the Morgan Center. DSHS has not revoked the voluntary placement agreement and the agency plans to continue offering casework services to the family. A dependency petition has not been filed.

## I. Mootness

DSHS appeals the March 1999 order, which placed R.J. at the Morgan Center for a 30-day evaluation. This 30-day order, together with later orders continuing R.J.'s placement at Morgan Center, has expired. Although the issue of the validity of the orders is moot, both parties ask

---

[1] Counsel advised the court during oral argument that R.J. is no longer at the Morgan Center.

us to address the issue. An appeal is moot where it presents purely academic issues and where it is not possible for the court to provide effective relief. *Klickitat County Citizens Against Imported Waste v. Klickitat County*, 122 Wn.2d 619, 631, 860 P.2d 390 (1993).

■ Although this case is technically moot, we can review it if matters of continuing and substantial public interest are involved. *In re Detention of Swanson*, 115 Wn.2d 21, 24-25, 793 P.2d 962, 804 P.2d 1 (1990). In deciding whether to address a moot issue, we consider the public or private nature of the question presented, the desirability of an authoritative determination for the future guidance of public officers, and the likelihood that the question will recur. *Sorenson v. City of Bellingham*, 80 Wn.2d 547, 558, 496 P.2d 512 (1972).

In this case, DSHS challenges the juvenile court's authority to order the specific placement of a child pursuant to a voluntary placement agreement. No Washington case has defined this authority under a voluntary placement agreement. And the court's authority under these circumstances presents a question of public importance. Finally, the issue is likely to recur and a ruling would give guidance to courts and public officers. *See In re Dependency of H.*, 71 Wn. App. 524, 859 P.2d 1258 (1993); *In re Welfare of J.H.*, 75 Wn. App. 887, 880 P.2d 1030 (1994) (some issues in child welfare cases found to be matters of continuing and substantial public interest).

Accordingly, we address the merits of the issue.

## II. Court's Statutory Authority in DSHS Voluntary Placement Agreements

DSHS contends that the juvenile court exceeded its authority when it ordered that DSHS place R.J. in a specific facility and that such placement would continue even if DSHS terminated the voluntary placement agreement. DSHS argues that the Legislature did not give the juvenile court this broad authority in the voluntary placement statutes.

## A. Background

Before 1997, a parent could seek DSHS out-of-home placement for a child with developmental disabilities only through the dependency process. *See* RCW 13.34.040; former RCW 13.34.030 (1988). The definition of a dependent specifically included a developmentally disabled child.[2] Former RCW 13.34.030(4)(d). This subsection was designed to assist parents who needed out-of-home placement solely because of a child's developmental disability. LAWS OF 1983, ch. 311, § 1.

Under this old scheme, the court was required to find dependency before the State could provide out-of-home services for a developmentally disabled child. *See In re Welfare of Key*, 119 Wn.2d 600, 836 P.2d 200 (1992). When dependency was shown, the State obtained authority over the child. *See id.*; chapter 13.34 RCW. While the parents did not permanently lose their parental rights, they also did not have full custody of their child. *See Key*, 119 Wn.2d at 609, 612. In dependency, the court was explicitly authorized to incorporate DSHS placement plans into court orders, determine what placement was in the best interest of the child, and make orders of disposition. RCW 13.34.130. The parents could veto a placement under dependency unless DSHS proved by clear, cogent, and convincing evidence that the placement was in the child's best interest. *Key*, 119 Wn.2d at 611; RCW 13.34.260. This is still the procedure for dependencies. But the Legislature has changed the process for developmentally disabled children.

In 1997, the Legislature eliminated subsection (4)(d) of former RCW 13.34.030 and replaced it with a process for voluntary placement agreements. RCW 74.13.350; RCW

---

[2] Subsection (2)(d) provided: a dependent child means any child: "(d) Who has a developmental disability, as defined in RCW 71A.10.020 and whose parent, guardian, or legal custodian together with the department determines that services appropriate to the child's needs can not be provided in the home. However, (a), (b), and (c) of this subsection may still be applied if other reasons for removal of the child from the home exist." Former RCW 13.34.030(4)(d).

13.34.270.[3] In doing so, the Legislature intended to meet the needs of developmentally disabled children with voluntary placement agreements between DSHS and parents. RCW 74.13.350. These agreements allow DSHS to place developmentally disabled children in foster homes and group care facilities without a finding of dependency. *See* RCW 74.13.350.

B. Interpretation of RCW 74.13.350 and RCW 13.34.270

This case presents a question of statutory interpretation, which we review de novo. *Franklin County Sheriff's Office v. Sellers*, 97 Wn.2d 317, 325-26, 646 P.2d 113 (1982). The purpose of our review is to give effect to the intent of the Legislature. Review begins with the plain language of the statute. *Lacey Nursing Ctr., Inc. v. Department of Revenue*, 128 Wn.2d 40, 53, 905 P.2d 338 (1995). Where a statute is unambiguous, legislative intent is determined from the language of the statute alone. *Waste Management of Seattle, Inc. v. Utilities & Transp. Comm'n*, 123 Wn.2d 621, 629, 869 P.2d 1034 (1994); *In re Eaton*, 110 Wn.2d 892, 898, 757 P.2d 961 (1988). Further, statutes should be construed to give meaning to each statute and to avoid absurd or strained consequences. *See id.* at 901.

RCW 74.13.350 states that "[w]henever the department places a child in out-of-home care under a voluntary placement pursuant to this section, the department shall have the responsibility for the child's placement and care." Under the terms of such an agreement, the parents retain legal custody. RCW 74.13.350. The statute requires DSHS to develop a permanency plan of care and this plan "shall be directed toward securing a safe, stable, and permanent home for the child as soon as possible." RCW 13.34.270; RCW 74.13.350.

DSHS argues that under these statutes a juvenile court lacks authority to order a specific placement, relying on *In re Welfare of J.H.*, 75 Wn. App. at 894-95; *In re Welfare of Lowe*, 89 Wn.2d 824, 576 P.2d 65 (1978); *In re Welfare of*

[3] Laws of 1997, ch. 386, §§ 7, 16, 19.

*Gakin*, 22 Wn. App. 822, 592 P.2d 670 (1979); and *In re Eaton*, 110 Wn.2d at 902.

In *Eaton*, the juvenile's mother had petitioned for an alternative residential placement under chapter 13.32A RCW. The statutes authorized DSHS to place the child "in a crisis residential center, foster family home, group home facility . . . or any other suitable residence to be determined by the department." *Eaton*, 110 Wn.2d at 896-97. And although chapter 13.32A RCW required the juvenile court to periodically review the DSHS plan for the child, the Supreme Court held that the juvenile court did not have authority under the statutes to order a specific placement, noting that "[t]his holding enables DSHS to fulfill its responsibility to all children in assuring that those most needy receive the limited available openings. DSHS should have been allowed to go through its own procedures to determine if [the school] was the most appropriate location for [the child]." *Eaton*, 110 Wn.2d at 899.

 The guardian ad litem counters that the juvenile court may direct a specific placement if the DSHS decision is "arbitrary, tyrannical, or predicated upon a fundamentally wrong basis . . . ." *Coalition for the Homeless v. Department of Soc. & Health Servs.*, 133 Wn.2d 894, 914, 949 P.2d 1291 (1997). In *Coalition for the Homeless*, the Supreme Court held that a juvenile court has the authority in a dependency proceeding to order DSHS to provide services to children who are in jeopardy of becoming dependents only because their parents are homeless. The court found that under RCW 13.34.060, the juvenile court must ensure that DSHS undertakes reasonable efforts to prevent or eliminate the need for removal of the child from the child's home. *Coalition for the Homeless*, 133 Wn.2d at 920. But the court noted that, on the arguments presented, it was "unable to hold that the court has general authority to oversee voluntary foster care placements." *Id.* at 924. And the order in *Coalition for the Homeless* was not a specific placement order, only an order that DSHS provide some sort of housing assistance to a family where homelessness

is the primary reason for foster placement of a child. The court concluded that "[a]lthough the nature of the services would be within the discretion of the Department, the adequacy of the service, or the reasonableness of the effort, is a determination to be made by the court." *Id.* at 925. Thus, although the court in *Coalition for the Homeless* reinforced the juvenile court's authority to order DSHS to comply with the applicable statutes, the court did not authorize the juvenile court to order a specific placement as the juvenile court did here. We next consider whether the statute authorizing juvenile court review of DSHS placements under the voluntary program provides such authority.

Under RCW 13.34.270, the juvenile court has limited authority to review placements under voluntary placement agreements. Within 180 days of the child's placement, DSHS is required to obtain a judicial determination that placement is in the best interests of the child. Further, permanency planning hearings are required and DSHS must submit a written plan setting out as a primary goal: (1) return of the child to his or her home; (2) adoption; (3) guardianship; or (4) long-term, out-of-home care. RCW 13.34.270(5)(c). And if the primary goal of the placement has not been met, the court "shall inquire regarding the reasons why the primary goal has not been achieved and determine what needs to be done to make it possible to achieve the primary goal." RCW 13.34.270(5)(d). But nothing in the statute purports to give the juvenile court authority to order a specific plan or placement. Rather, the statute clearly delegates to DSHS authority to devise a plan with the court having authority to approve or disapprove.

We hold that, just as in *Eaton*, the Legislature did not grant the court authority to order specific placement of a developmentally disabled child under RCW 74.13.350.[4]

---

[4] We understand that the trial court was faced with a frustrating situation with DSHS continuously shifting R.J. between providers and failing to provide an appropriate placement. We recognize the trial court's well-meaning intent to provide a placement that would best promote R.J.'s interests. But while the best

■ Further, the court exceeded its authority when it ordered that the DSHS could not terminate the voluntary placement agreement with the specific placement at the Morgan Center. RCW 13.34.270(6) explicitly provides that "[a]ny party to the voluntary placement agreement may terminate the agreement at any time." When a voluntary placement agreement is terminated, the child is returned to the care of the child's parents or legal guardian unless the child has been taken into custody pursuant to statute, and any action on the voluntary placement agreement shall be dismissed. RCW 13.34.270(6). Here, the juvenile court ignored the statute and ordered that R.J. remain at the Morgan Center for 30 days "until further court order regardless of whether the Department revokes the Voluntary Placement Agreement." We hold the juvenile court acted outside its authority and contrary to RCW 13.34.270(6) when it restricted the right of DSHS to terminate the agreement.

The juvenile court had no authority to order that R.J. be placed at the Morgan Center. The orders directing the Morgan Center placement are vacated.

SEINFELD and HOUGHTON, JJ., concur.

interests of a child are of paramount importance, the manner of addressing those interests has been set forth by the Legislature. Courts are bound by that body's decisions even when they disagree with them. The trial court exceeded its statutory authority by ordering placement of R.J. at the Morgan Center.