IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Dependency of )    No. 73366-4-I
A.M., D.O.B. 06/01/2014, )
   )
         A minor child. )    DIVISION ONE
   )
STATE OF WASHINGTON, )
DEPARTMENT OF SOCIAL AND )
HEALTH SERVICES, )
   )
         Respondent, )    UNPUBLISHED OPINION
   )
         v. )
   )
MATTIE MACARTHUR, )
   )
         Appellant. )    FILED: January 11, 2016

SCHINDLER, J. — Mattie MacArthur appeals the order of dependency for A.M. rejecting her request for an in-home placement. Because the findings are supported by substantial evidence and the findings and conclusions satisfy the statutory criteria, we affirm.

## FACTS

The unchallenged findings establish the following. Mattie MacArthur is the biological mother of six children and her youngest child, A.M., was born June 1, 2014 and is the subject of this dependency. Christopher Brown is the biological father of A.M.

MacArthur and Brown started living together in 2010 and in 2011, MacArthur gave birth to their child, A.B. In September 2011, MacArthur and Brown separated for approximately one month due to an argument that resulted in MacArthur's mother calling police. In a police report signed under penalty of perjury, MacArthur stated that Brown punched her in the face with a closed fist while she was holding three-week-old A.B. MacArthur admitted grabbing a knife during the incident and cutting Brown with it. She made similar statements in a domestic violence report under penalty of perjury, saying Brown punched her in the face and caused a laceration and swelling under her eye. The State charged Brown with fourth degree assault domestic violence and the superior court entered a no-contact order.

In April 2012, MacArthur and Brown violated the no-contact order and stayed together at a motel with her children. While at the motel, they argued loudly and the police were called. Before the police arrived, MacArthur and Brown left the motel in a car, leaving the children alone. MacArthur convinced Brown to stop the car and walked back to the motel. The State charged Brown with a misdemeanor violation of the no-contact order. In February 2013, Brown was convicted of fourth degree assault domestic violence and misdemeanor violation of a no-contact order. The court entered a criminal no-contact order prohibiting Brown from having contact with MacArthur for two years. The court also ordered Brown to "participate in a type of domestic violence treatment known as moral reconation therapy." Brown never complied with this requirement.

While the charges against Brown were pending, MacArthur's son J.W. reported that MacArthur and Brown injured him with excessive physical discipline. Specifically,

2

J.W. alleged MacArthur twisted his arm, threatened to break it, slammed him into a wall, kicked him in the stomach, and hit him in the face. J.W. alleged Brown hit him with a belt and MacArthur allowed Brown to discipline the other children. Child Protective Services (CPS) investigated and in June 2012, the Department of Social and Health Services (Department) filed dependency petitions and removed the children from MacArthur's custody.

In October 2012, MacArthur agreed to an order of dependency. Department caseworker Jennifer Johnson told MacArthur that "continuing a relationship with Chris Brown posed a risk to her and her children and definitely posed a barrier to her getting her children back." MacArthur denied having any current relationship with Brown.

In December 2012, the court entered an order of default against Brown and an order of dependency as to A.B. Brown never sought visitation or participated in parenting services. As a result, his parental rights to A.B. were terminated.

In March 2013, Brown signed a parenting plan and agreed that his residential time with his son by another mother should be restricted because of a history of acts of domestic violence.

On January 21, 2014, police responded to a domestic disturbance at MacArthur's residence. MacArthur's father had a cut above his right eye, and he was taken by ambulance to the hospital. After speaking with MacArthur's father, the responding officer recommended assault charges be filed against Brown.

In early 2014, the Department learned MacArthur was pregnant with A.M. Although MacArthur initially refused to answer questions about the father's identity, she later admitted Brown was the father and A.M. was conceived while a criminal no-contact

3

order was in place. The Department also learned Brown had accompanied her to a prenatal appointment in violation of the no-contact order.

Brown was present at A.M.'s birth. Caseworker Johnson notified police who arrested Brown for violating the no-contact order. The Department filed a dependency petition as to A.M. because of the risk to the child posed by Brown, by "MacArthur's continuing relationship with an abuser, and Ms. MacArthur's inability to separate herself from her abuser."

At trial, MacArthur testified to a long history of domestic violence perpetrated by her own father and the fathers of her six children. MacArthur testified that her father was violent toward her, her mother, and her sister. MacArthur testified the father of her son J.W. pushed her while she was holding J.W. She recalled "having the baby in my arms, and I flew back and landed on the bed." She described another incident where J.W.'s father "jumped up on top of me and started — he was open-handed, but by the time he was done, every blood vessel in my face was popped."

MacArthur said the father of A.H. and E.H. pushed her when she was pregnant, causing her to go to the hospital. She testified that on another occasion, he "brutally beat" and "almost killed" her in front of her children. He also threw a brick through her door, resulting in her eviction. When asked if her four oldest children witnessed any of these incidents, MacArthur said, "[Y]es." When asked if they witnessed incidents of domestic violence more than once, she said, "Yeah, [J.W.] mostly, yeah." MacArthur testified A.H. and E.H.'s father spent six months in jail and T.O.'s father "ended up in prison for murder."

4

MacArthur's testimony regarding Brown's acts of domestic violence differed significantly from versions of the incidents she provided in prior reports. When asked about her statement to police that Brown punched her in the face as she held her baby, MacArthur testified she lied to police, and claimed Brown had only pushed her. Although she admitted being with Brown at the motel in violation of a no-contact order and leaving her children alone in the motel room, she recanted the statement she made to police that Brown pushed her to the ground in the parking lot.

MacArthur testified she had not seen Brown since A.M.'s birth. However, she conceded Brown was providing her financial support, they still shared a phone plan and storage locker, and she had vehicles that were registered and insured in his name. She admitted lying about her connections with Brown. While MacArthur testified Brown would benefit from parenting classes, she did not believe he posed any risk to her children or needed treatment or counseling for "anger or his physical violence."

Jennifer Johnson was MacArthur's caseworker from February 2013 to September 2014. Johnson testified she was concerned about MacArthur's ongoing relationship with Brown. Johnson testified that the ongoing relationship violated a no-contact order and showed MacArthur did not appreciate the nature of the risk Brown posed to her children, her domestic violence history, or her own risk of being a victim of domestic violence. Johnson testified she expressed these concerns to MacArthur, and expressly warned her of the consequences that "continuing in a relationship with an abuser would have on the potential for reunification [with her children]."

When MacArthur became pregnant with A.M., Johnson testified that she asked if Brown was the father. Johnson testified MacArthur lied and said Brown was not the

father. When Johnson learned that Brown was present at A.M.'s birth, she contacted CPS. Johnson testified that her concern for A.M.'s safety was based on the recent incident of violence against MacArthur's father in the home, the no-contact order, the existing dependencies for MacArthur's other children, and Brown's "untreated domestic violence treatment needs."

Johnson testified that when the Department filed a dependency petition as to A.M., she told MacArthur the petition was necessary because MacArthur's "failure to demonstrate her ability . . . to separate herself from the abuser" created a risk to A.M. Johnson testified that when children are exposed to domestic violence,

> . . . there is the concern for children in that it impacts and/or delays their social, emotional stability, well-being. In addition, there's always the instance of violence escalating and lethality for the parent and/or an injury that could be caused to the child in the midst of the violence that's occurring in the home. . . .
>
> . . . .
>
> . . . I believe that at certain ages, clearly there would be regression that could be identified in regard to emotional stability for an infant. It may be failure to thrive. For a preschooler, it may be bedwetting. For a middle school child, it may be again outbursts of social, emotional issues in social settings: Hitting, biting, fearful of returning home, hiding at school and/or in the home, not making educational or academic progress.

Johnson said she found it "alarming" that Brown recently gave MacArthur cars and financial support and that they shared a storage locker. Johnson testified she had discussed those issues with MacArthur "at great length and in great detail."

Jonathan Carter, the court-appointed special advocate (CASA) for A.M. and MacArthur's other dependent children, testified he was concerned by MacArthur's

6

ongoing relationship with Brown and her inability to recognize the risk he posed to her and her children.

> The primary reason is because of the abusive nature of [Brown] and his history and [MacArthur]'s history with him resulting initially in the first five children being taken away . . . and their apparent continuing relationship throughout the course of my CASA work . . . and [MacArthur]'s failure or inability to recognize him as a risk to her and her children and the fact that she has continually been untruthful with me in my attempts to seek information about [Brown] and her relationship with [him].

A recent visit to MacArthur's residence heightened Carter's concerns. Carter testified he knocked on MacArthur's door and waited several minutes before MacArthur finally opened the door. When Carter asked if he could come in, MacArthur said, "[J]ust a minute," shut the door, and did not open it for several more minutes. When she did, Carter noticed a couple pairs of extremely large shoes and men's coats and jackets in the front closet. When Carter asked who the large shoes belonged to, MacArthur said she sold shoes. Carter testified he asked MacArthur if she had seen Brown and she said, "I have not seen him in a year." Carter testified Brown gave him that exact same answer every time he asked her when she had last seen Brown.

Carter left the apartment and watched from his car and wrote down the license plate numbers of several cars parked outside the apartment. Carter testified he saw a "very large" man on the landing next to MacArthur's front door. The man looked at Carter and then disappeared. Carter said that because he did not see the man go up or down the stairs from the landing, he assumed the man entered MacArthur's apartment. Carter testified that the man looked like the man in the driver's license photograph of Brown. Carter also testified that a maintenance man at the apartment identified Brown

from a photograph.[1] Carter later learned that two of the car license plate numbers he had written down were for cars registered to Brown.

Carter testified that a dependency was in A.M.'s best interest. Carter said his "major concern" was that MacArthur "does not perceive or appreciate the risks to herself and her children [from] the bad relationships she's had with bad men over the course of her adult life, including Mr. Brown." He noted there were "all the indications that [MacArthur and Brown] have a relationship and that he's still a major part of her life. And . . . I believe [he] poses a danger both to her and to the children based upon his prior record and his failure to obtain any of the court-ordered services." Carter also noted MacArthur's "extremely poor judgment in her choice of partners," two of whom had been charged with attempted murder. Carter concluded that MacArthur did not know how to discipline her children without "abusive conversations and arguments and violence." Carter conceded that this opinion was based on MacArthur's behavior with her other children prior to their removal and prior to MacArthur receiving services.

Department social worker Charles Loeffler testified that he took over MacArthur's case in June 2014. He recommended MacArthur participate in a psychological evaluation in order to determine why, despite services, she continued to be involved with Brown. MacArthur initially agreed to the evaluation but later changed her mind. During that timeframe, MacArthur asked that A.M. be placed with Brown's sister. Loeffler testified this concerned him because MacArthur had told him she had ended

---

[1] The court admitted this evidence for the basis of Carter's recommendations and not for the truth of the matter asserted.

her relationship with Brown, and he wondered "why would she be in a relationship with his family."

Loeffler also testified about his concern over statements made by Brown's sister. Loeffler testified Brown's sister told him that "to the best of her knowledge . . . , [Brown] was still living with Ms. MacArthur."[2] She also told Loeffler that Brown and MacArthur brought out the worst in each other.

When asked about MacArthur's testimony that Brown had only pushed her in 2011, Loeffler said MacArthur was minimizing and that caused him concern "about her ability to protect herself or [A.M.] in the future." Loeffler concluded MacArthur could not adequately parent A.M. because of her relationship with Brown.

> MacArthur has throughout this dependency characterized her relationship with Chris Brown as either nonexistent at times or diminishing at times, and that's proven time and time again to not be the case. She appears to still be very much involved with him . . . from him attending prenatal appointments and appearing at the birth of the child to more recently providing . . . monetary support to her and continuing as she testified to share bills . . . , share property[ and] rented space with each other. And it appears that he was seen outside of her home.
> Mr. Brown has never come forward to participate in services . . . . He's dangerous not only to [MacArthur] but also to any children that are in her home. He has a founded finding for physical abuse that has never been addressed through services.

When asked if he could add anything to caseworker Johnson's testimony about the effects of domestic violence on children, Loeffler testified:

> Well, they're seeing a caregiver, a person who's responsible for ordering their entire world, making sense of it, being the arbiter of everything to that child, is also the person that is causing immense chaos and violence and threatening the existence of another, and a child can't distinguish, you know, that . . . dad's only going to hurt mom, he's not going to hurt me.

---

[2] The sister's hearsay statements were admitted "solely for risk assessment purposes."

> The child is thinking: I'm next. And that trauma will play out in that child's life throughout the rest of their lives.

Mental health counselor and child custody evaluator Dr. Carmela Washington-Harvey conducted a psychosocial evaluation of MacArthur. Dr. Washington-Harvey testified MacArthur reported being physically abused by her boyfriends and the fathers of her children. MacArthur denied, however, that Brown ever assaulted her, saying he was a "good man." Although MacArthur struggled with accepting the possibility of Brown not being in her life, Dr. Washington-Harvey felt MacArthur was close to a breakthrough when their sessions ended in November 2014. Dr. Washington-Harvey added, however, that the next step would be "developing a safety plan for [MacArthur] and her children. That would involve Mr. Brown not being [with MacArthur] until he was able to come forward and complete services and be in compliance." Dr. Washington-Harvey testified she believed MacArthur had made progress in recognizing the risk of domestic violence in her relationship with Brown but she questioned MacArthur's "commitment and acceptance" of what needed to happen.

> You know, you can recognize something, but if you don't accept the fact that this needs to happen, you don't have the commitment to change that is needed in order to develop those plans for safety and all.

When asked if it would concern her to learn that Brown had recently been seen at MacArthur's apartment and that they were still in a relationship, Dr. Washington-Harvey said, "Yes."

The court rejected MacArthur's testimony about whether Brown committed domestic violence as not credible and found that "[n]either Ms. MacArthur nor Mr. Brown

10

abided by the terms of [the] No-Contact Order." The court concluded that under the

statutory criteria, A.M. was dependent, and entered the following additional findings:

11.　. . . [D]espite years of domestic violence counseling and therapy, the court finds that Ms. MacArthur has continued her relationship with Chris Brown, and has invited him into her home as recently as early February of 2015. She continues to believe that Chris Brown is not a physical risk to her, and not a physical risk to her children. And while she readily admits that she has been victimized by other partners, she insists she has not been abused by Mr. Brown. She is minimizing the risk that he poses to her. At the same time, however, she admits that she and Chris Brown have argued verbally, she describes herself as a yeller, and she admits that she has assaulted him. The court finds that Chris Brown has in fact assaulted her despite her testimony to the contrary.

12.　The court finds credible Mr. Carter's testimony that as recently as February 2015 he observed Mr. Brown near Ms. MacArthur's apartment after he saw shoes and clothing consistent with a man of Mr. Brown's size inside the apartment. This circumstantial evidence convinces this court, on a more probable than not basis, that Mr. Brown was in fact present in that apartment when Mr. Carter made his unannounced visit. The court does not find credible, Ms. MacArthur's testimony that those shoes were in her apartment merely for her to sell.

13.　Mr. Brown is also providing Ms. MacArthur financial support in the form of money, cars, and payment of bills. Ms. MacArthur has refused to terminate this relationship, and this relationship does present a danger of substantial damage to [A.M.]'s psychological and physical development. Ms. MacArthur and Mr. Brown have had a very contentious relationship filled with arguments, physical abuse, and arguments with family members. Ms. MacArthur does not appreciate that allowing her children to observe these verbal and physical fights can have a serious detrimental impact on [A.M.]'s development. It could delay her social and emotional development and lead to very serious behavioral problems.

14.　Ms. MacArthur has testified that she understands the CASA and Department's concerns but despite that understanding, she has not yet been able to take action to end a relationship that does present a serious risk to her and her children.

15. Chris Brown is a convicted domestic violence batterer. In March of 2013 he signed a parenting plan in which he admitted that his residential time with his son . . . should be limited or restrained completely because of a history of acts of domestic violence. (Ex 16) The risk in this case is that if [A.M.] is returned to Ms. MacArthur, Ms. MacArthur will more probably than not, invite Chris Brown back into her home and create a risk of harm to [A.M.] Mr. Brown has not come forward to request visitation with [A.M.] He has not expressed any interest in parenting this child, and he has not engaged in any services to address very clear parenting deficiencies.

16. For these reasons, the court concludes that [A.M.] does not have a parent capable of adequately caring for her such that she is in danger of substantial damage to her psychological and physical development.

The court rejected an in-home placement for A.M. The court found there was "no parent or guardian available to care for the child." The court further found there was "a manifest danger . . . that the child will suffer serious abuse or neglect if the child is not removed from the home, and an order under RCW 26.44.063 will not protect the child from danger."

MacArthur appeals the dependency and disposition order.

ANALYSIS

Standard of Review

Parents "have a fundamental liberty interest in the care and welfare of their minor children." In re Dependency of Schermer, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). However, the State has an "interest in protecting the physical, mental, and emotional health of children" and a parens patriae right and responsibility to intervene and protect a child "when a child's physical or mental health is seriously jeopardized by parental deficiencies." Schermer, 161 Wn.2d at 941; RCW 13.34.020 ("the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is

12

jeopardized"). In balancing these interests, "the rights and safety of the child . . . shall be the paramount concern." RCW 13.34.020. To that end, the legislature adopted a statutory procedure to determine whether a child is dependent, transferring legal custody to the State. Schermer, 161 Wn.2d at 942 (citing RCW 13.34.030(6)). The State must prove by a preponderance of the evidence that the child meets one of the statutory definitions of dependency. RCW 13.34.110(1); Schermer, 161 Wn. 2d at 942; In re Welfare of Key, 119 Wn.2d 600, 612, 836 P.2d 200 (1992). The court has broad discretion in evaluating the evidence when determining whether a dependency order should be entered and in reaching " 'a decision that recognizes both the welfare of the child and parental rights.' " Schermer, 161 Wn.2d at 952 (quoting In re Welfare of Becker, 87 Wn.2d 470, 478, 553 P.2d 1339 (1976)).

Review of a dependency decision is limited to determining whether substantial evidence supports the trial court's findings and whether the findings, in turn, support the conclusions of law. Schermer, 161 Wn.2d at 940. "Substantial evidence exists if, when viewing the evidence in the light most favorable to the prevailing party, a rational trier of fact could find the fact more likely than not to be true." In re Welfare of X.T., 174 Wn. App. 733, 737, 300 P.3d 824 (2013). We review a juvenile court's placement decision in a dependency proceeding for an abuse of discretion. In re Dependency of A.C., 74 Wn. App. 271, 275, 873 P.2d 535 (1994).

Dependency/Sufficiency of the Evidence

The superior court concluded that A.M. was dependent under RCW 13.34.030(6)(c). RCW 13.34.030(6)(c) states a child is dependent if they have

no parent . . . capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development.

Citing Schermer, 161 Wn.2d at 951-52, MacArthur argues RCW 13.34.030(6)(c) requires proof of a "substantial risk of harm" to a child, and there was insufficient evidence that such a risk exists in this case. Schermer does not support MacArthur's contention. While the court in Schermer used the words "substantial risk of harm" at one point, the court did not purport to interpret or modify the statutory requirement recited earlier in the decision that the Department must show a " 'danger of substantial damage to the child's psychological or physical development.' " Schermer, 161 Wn.2d at 952, 943 (quoting RCW 13.34.030(6)(c)).

MacArthur also challenges the court's findings that MacArthur "will more probably than not, invite Chris Brown back into her home and create a risk of harm to [A.M.]," and that this probability creates a danger of substantial damage to A.M.'s psychological or physical development. MacArthur contends these findings "are not supported by substantial evidence and rest on a series of tenuous predictions." We disagree.

The Department submitted strong direct and circumstantial evidence that MacArthur and Brown were in a continuous ongoing relationship, that MacArthur lied about her relationship with Brown, and that the relationship would likely continue if A.M. were placed with her. Contrary to MacArthur's assertions, the evidence showed neither the no-contact orders nor the threat of removing A.M. were likely to deter MacArthur and

Brown from continuing the relationship. They repeatedly violated no-contact orders in the past, and they continued their relationship despite repeated warnings that doing so would preclude the return of the children to MacArthur's care. MacArthur's claim that Brown's domestic violence history "was mitigated due to the passage of time" is not supported by the record. For example, the undisputed fact that Brown has not received domestic violence treatment demonstrates no progress or commitment to change.

In the alternative, MacArthur argues that even if the findings regarding the risk of exposure to domestic violence were supported by substantial evidence, the record does not support the finding that such exposure created a danger of <u>substantial damage</u> to A.M.'s physical or psychological development. Again, we disagree.

Caseworkers Johnson and Loeflerr each have a master's degree in social work. Both Johnson and Loeflerr testified to a range of adverse effects suffered by children who witness domestic violence. Those adverse effects include emotional, developmental, physical, and academic problems that may be fairly characterized as substantial psychological or physical damage. Although MacArthur argues in passing that the caseworkers' testimony was insufficient because they were not "experts," she cites no supporting authority and overlooks authority to the contrary. <u>Saldivar v. Momah</u>, 145 Wn. App. 365, 398-99, 186 P.3d 1117 (2008) (citing cases and holding that social workers with graduate degrees and experience may testify as experts regarding conditions related to domestic violence).[3]

---

[3] While MacArthur also offers law review articles allegedly questioning the extent to which children are harmed by witnessing domestic violence, it appears this evidence was not presented below. We will not consider it for the first time on appeal. <u>See</u> <u>State v. Vasquez</u>, 95 Wn. App. 12, 16, 972 P.2d 109 (1998) (refusing to consider journal article for the first time on appeal).

Out-of-Home Placement

MacArthur also contends the trial court abused its discretion in denying her request for an in-home placement for A.M. The court did not abuse its discretion.

Once a court determines that a child is dependent, it must enter an order of disposition. RCW 13.34.130. The court may order the child removed from the home if any one of the following statutory prerequisites are satisfied: (a) there is "no parent or guardian available to care for such child;" (b) the "parent, guardian, or legal custodian is not willing to take custody of the child;" or (c) "by clear, cogent, and convincing evidence, a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home." RCW 13.34.130(5). The court in this case determined that subsections (a) and (c) applied and denied an in-home placement for A.M.

MacArthur contends the court erred in concluding subsection (a) applies in this case. Noting that the word "available" is not statutorily defined, she points to dictionary definitions defining "available" as something "at disposal" and "that is accessible or may be obtained." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 150 (1993). Based on these definitions, she contends the meaning of "available" is plain. But the plain meaning of an undefined statutory term is not discerned by simply looking at dictionary definitions. State v. Lilyblad, 163 Wn.2d 1, 9, 177 P.3d 686 (2008)[4] ("All words _must_ be read in the context of the statute in which they appear, not in isolation or subject to all possible meanings found in a dictionary."); Prostov v. Dep't of Licensing, 186 Wn. App.

---

[4] Emphasis added.

795, 806, 349 P.3d 874 (2015). Rather, courts must also examine the term in the context of the statute, related provisions, and the statutory scheme as a whole. Hayfield v. Ruffier, 187 Wn. App. 914, 918, 351 P.3d 231 (2015). Because MacArthur fails to address the meaning of "available" in light of the statutory scheme, we conclude her challenge to the court's reliance on RCW 13.34.130(5)(a) is inadequately briefed.[5]

MacArthur also challenges the court's determination under RCW 13.34.130(5)(c) of clear, cogent, and convincing evidence that "a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home." She contends there is insufficient evidence to meet the clear, cogent, and convincing evidence requirement. We conclude the record supports the court's determination under subsection (c). RCW 13.34.130(5).

Clear, cogent, and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable. In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995). The evidence at trial demonstrated MacArthur's long history of relationships with violent men, Brown's acts of violence during their relationship, Brown's failure to obtain domestic violence treatment, Brown's and MacArthur's repeated violations of no-contact orders, and MacArthur's inability to end their relationship. The caseworkers' testimony demonstrated a danger of serious psychological and physical harm to A.M. from domestic violence in the home.

---

[5] Considering the statutory scheme and the focus on the best interests of the child, it seems highly doubtful that the word "available" in RCW 13.34.130(5)(a) simply means a parent "at disposal." Furthermore, the Department correctly points out that other dictionary definitions of "available" connote much more than simple availability. See WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 141 (1984) (emphasis added) (defining "available" as "[a]ccessible for use: at hand" or "[h]aving the qualities and the willingness to take on a responsibility"). We also note that a mother who fails to perceive that she is putting her child at risk of domestic violence is not available to care for the child.

In addition to the trial testimony, the evidence submitted at the disposition hearing included a statement from the motel manager who witnessed the 2012 motel incident. The manager stated that Brown threatened to "hit [MacArthur] and her son" and shoved MacArthur to the ground. In addition, a sheriff's incident report regarding the January 2014 incident at MacArthur's residence stated that Brown assaulted MacArthur's father. Taken together, the evidence presented at the trial and disposition hearing provided clear, cogent, and convincing evidence that an in-home placement would expose A.M. to a manifest danger of serious abuse or neglect.[6]

MacArthur argues the evidence was not clear, cogent, and convincing because the trial court allowed unsupervised visits with A.M. despite the Department's contention that A.M. would be vulnerable to contact with Brown during such visits. The court's decision to allow limited unsupervised visits with A.M. does not undermine its reasons for rejecting an in-home placement. It is clear from the court's oral ruling that it regarded limited unsupervised visits as a means to give MacArthur incentive to make the progress she needed for reunification. The court strictly limited the visits to one day a week with no overnights, required no contact with Brown or any other male partner, and authorized unannounced visits by the Department. The decision to reject an in-

---

[6] In her opening brief, MacArthur argues in passing that the evidence was insufficient to show a danger of serious abuse or neglect because "[t]here was no contention that A.M. would suffer abuse or neglect in Ms. MacArthur's care, only that [A.M.] might be exposed to a future act of domestic violence by Mr. Brown." She cited no authority for her implicit contention that exposure to domestic violence does not qualify as either abuse or neglect. We need not consider arguments unsupported by authority. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). For the first time in her reply brief, MacArthur offers statutory analysis and authority to support her implicit claim. This comes too late. Cowiche Canyon, 118 Wn.2d at 809.

No. 73366-4-I/19

home placement with MacArthur is supported by the record. The placement decision was well within the court's discretion.

We affirm the dependency and disposition order.

WE CONCUR: