

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

In the Matter of the Dependency of     )
                                         )
A.C.,†                                   )
             Minor Child.       )
                                           )
C.P.,                                      )
                                           )
             Appellant,          )
                                           )
         v.                                 )
                                           )
DEPARTMENT OF SOCIAL &       )
HEALTH SERVICES,             )
                                           )
             Respondent.       )
                                           )
In the Matter of the Dependency of     )
                                         )
A.C.,                                    )
             Minor Child.       )
                                           )
V.C.,                                   )
                                           )
             Appellant,          )
                                           )
         v.                                 )
                                           )

No.  37999-0-III
(Consol. w/ No. 38042-4-III)


UNPUBLISHED OPINION

---

† To protect the privacy interests of A.C., a minor, we use his and his parents' initials throughout this opinion.  Gen. Order for the Court of Appeals, *In re Changes to Case Title* (Wash. Ct. App. Aug. 22, 2018).

Nos. 37999-0-III and 38042-4-III (consolidated)
*In re Dependency of A.C.*


DEPARTMENT OF SOCIAL        )
HEALTH SERVICES,               )
                                      )
            Respondent.        )

SIDDOWAY, C.J. — The mother and father of now 18-month-old A.C. challenge a finding of dependency and out-of-home placement ordered several months after A.C.'s premature birth. Both challenge the trial court's consideration of hearsay and the sufficiency of admissible evidence to support its finding that A.C. had no parent, guardian, or custodian capable of adequately caring for him. The father also contends the court abused its discretion by ordering him to undergo assessments or evaluations for chemical dependency and domestic violence.

Despite the fact that the contested hearing was conducted by Zoom, the Department of Children, Youth, and Families (Department) relied to a surprising extent on hearsay reports of what Department employees say they heard from hospital staff, family members, visitation facilitators, service providers, and law enforcement personnel rather than call the prescient witnesses, even when they knew matters were disputed. Nevertheless, given the remedial, nonpermanent character of a dependency proceeding and the Department's burden of establishing a child's dependency by only a preponderance of the evidence, the admissible evidence was sufficient. We affirm.

2

Nos. 37999-0-III and 38042-4-III (consolidated)
*In re Dependency of A.C.*

FACTS AND PROCEDURAL BACKGROUND

The mother and father of A.C., who were living in Idaho before his birth, were driving to a Social Security hearing in Tacoma when their car broke down in Spokane. Soon after being waylaid by the car trouble, the mother went into labor, six weeks prematurely. The couple went to Sacred Heart Hospital and A.C. was born 40 hours later on October 10, 2020. A.C. suffered from breathing and feeding issues and was admitted to the neonatal intensive care unit, where he was temporarily placed on a ventilator and feeding tubes.

On the day A.C. was born, the Department received an intake report from hospital staff requesting its involvement. A.C.'s umbilical cord had tested positive for marijuana and hospital staff reported that the mother and father were currently homeless and living in their car, with no family or friends in Spokane. The parents had no supplies to care for their premature newborn upon discharge. The hospital also reported concerns about the mother's ability to care for A.C., based on a perception that she had developmental delays and staff was having to intervene to coach her on how to respond to her son's cues and how to hold him properly.

Michelle Woodward, a CPS[1] investigator for the Department, was assigned to A.C.'s case two days after his birth, on October 12, and made her first contact with the

_____

[1] Child Protective Services (CPS) is a section of the Department that investigates child abuse and neglect reports. *See* RCW 26.44.020(4), (5).

3

parents by phone on October 14. Between then and November 4, when she transferred

the case to Department social worker Diana Barnes, Ms. Woodward spoke by telephone

with the parents and reviewed or obtained information from third parties, conducted a

family team decision meeting on October 21, and, on October 22, filed a dependency

petition and motion to take A.C. into Department custody. An order removing A.C. from

his parents' care and authorizing the Department to take him into custody upon his

discharge from the hospital was entered the same day.

Following a contested shelter care hearing held on October 29 and 30, the trial

court ordered that A.C. remain in the custody of the Department, to be placed in foster

care. The trial court's findings following the shelter care hearing summarize the

concerning information that had been gathered by Ms. Woodward and respects in which

it was disputed by the parents:

> The parents recently arrived to Spokane from Idaho and there was
> testimony that they were previously living out of their car, though they
> testified that they are currently living in a Spokane hotel. The father has an
> active warrant out of Idaho and was forthcoming in reporting to the court
> that this warrant is still active.
>
> The father is a registered sex offender for an assault of a minor and was
> recently convicted for failure to register. The father also has criminal
> history relating to the assault of a corrections officer.
>
> Concerns were expressed to the court that the mother is developmentally
> delayed and that she herself is a vulnerable adult and perhaps unable to
> provide for herself. Additional concerns were expressed regarding the

4

father engaging in controlling behavior as to the mother and claiming to have power of attorney over her, in a way that would allow him to control most, if not all, aspects of her life.

Neither parent had been willing to disclose to the department where they were living prior to the hearing. There was testimony that prior to arriving to Spokane the parents were living in a car in Idaho.

Concerns were reported to the court that the father had displayed aggressive and threatening behavior on various occasions, to include remarks against the assigned social worker and staff at the hospital where the infant was born. The father's behavior at the hospital resulted in security and/or law enforcement being called and the father climbing onto the hospital bed where the mother was laying and wrapping his arms and legs around her in some fashion to avoid removal. The father denied these allegations and denied that the event took place in the manner described by the state. However, there was testimony given that the father damaged hospital equipment and was cited and trespassed from the hospital.

The court further heard testimony that the father has described himself as a narcissist and would quote, "end people," who made any attempts to intervene with his right to parent. Law enforcement is currently pursuing an investigation on these direct and implied threats.

Additional concerns include, that if the child were returned to the parents, they would flee Spokane and not avail themselves of any support services. Supporting this theory is the fact that they just arrived in Spokane and are not long-term residents. Additionally, there are no family members who could serve as a relative placement in Spokane.

The court also heard testimony that various family members have reported witnessing domestic violence and controlling behavior directed at the mother by the father, which occurred during the most recent pregnancy. Both parents denied this.

Historically both parents have used methamphetamines in the past; however, the mother denied any current drug use except for THC.[2]

Clerk's Papers (CP) at 40-41.

---

[2] Tetrahydrocannabinol.

The only services ordered by the trial court were for the mother: she was ordered to participate in 30 days' random UA/BA (urinalysis/breathalyzer) testing and participate in an evidence-based parenting program. The order directed the Department to provide supervised visits three times a week for one hour each, to be increased to two-hour visits after one month of no safety concerns.

A contested fact-finding hearing on the Department's dependency petition was held almost three months later. The first witness called by the Department was Ms. Woodward. She was questioned about the report that triggered the CPS investigation. When she began to recount concerns that hospital staff reported about A.C.'s mother and father, the father's lawyer objected that she was providing hearsay. The Department responded, "She is an expert . . . giving her opinion based on information she received." Report of Proceedings (RP) at 11. The objection was overruled. Ms. Woodward proceeded to testify that hospital staff expressed concerns about the mother's ability to care for A.C., whether she was ambulatory, "pretty extensive concerns about domestic violence," and "about drug use." *Id.* She expanded on information hospital staff reported to explain its impression that the father was controlling and potentially domestically violent.

Ms. Woodward's narrative response turned to her investigation the prior October and what she learned from members of the mother's family about alleged physical abuse

by the father, at which point defense counsel objected again that it was "ongoing hearsay." RP at 12. The objection was implicitly overruled, and counsel was allowed to have a standing objection to hearsay from Department witnesses.[3]

Ms. Woodward proceeded to testify to detailed information critical of the mother's and father's ability to parent that she had gleaned from hospital records (records that were not themselves offered in evidence[4]) or had been told by members of the mother's extended family. She had learned that the mother had a child who was not in her care due to the mother's use of methamphetamine during the pregnancy; that child had been adopted by the mother's sister. During the family team decision meeting, the mother's family members recounted seeing two acts of physical violence by the father: there was a report that he had dragged the mother by her arms during the pregnancy and a report that he had committed an assault that the mother had taken responsibility for as her own fault.

Ms. Woodward recounted that "law enforcement" told her about "some issues" involving the father in Tacoma that they were not going to arrest over and that she "didn't quite 100 percent understand what any of that meant." RP at 17.

---

[3] It would have been prudent for counsel to have renewed the objection when a second social worker also testified to hearsay, but the standing objection requested and allowed—"a standing objection to *information coming in that isn't from the individuals themselves*"—was sufficient to apply to later witnesses. RP at 12 (emphasis added).

[4] An order authorizing the Department to have access to A.C.'s health and medical records had been entered on November 2, 2020.

Ms. Woodward testified to some knowledge that was firsthand or otherwise admissible. The father had told her about his criminal history, all of it in Idaho. The father, who was 45 years old at the time of the hearing, had received his first conviction for possession of marijuana. His second conviction was for sexual battery of a 16 or 17 year old committed soon after he was released for the marijuana charges, which accounted for his sex offender status. He had a third conviction for aggravated battery of a corrections officer, and a fourth conviction for failure to register as a sex offender.

Ms. Woodward testified that the father told her, and then reminded her several times, that he held a power of attorney for the mother, that the mother was unable to care for herself and he was her only caregiver, and that he was the head of the household and made all the decisions for the family. She described her own observations and impression of his domineering relationship with the mother. She testified that the father described himself to her as a narcissist. She testified to postings by the father on Facebook that included recordings of his altercations with police and security personnel, and his recordings of smoking marijuana quite a bit throughout the day. She testified it was "very obvious" that the marijuana use "[is] affecting how he's acting in the videos." RP at 18.

She was aware that a bishop of the Latter Day Saints (LDS) church that the parents had just met had arranged for the parents to stay in a motel for the first several weeks after their arrival in Spokane.

8

The Department's second witness was Department social worker Donna Barnes. Ms. Barnes testified that on taking over the case on November 4, she encouraged the parents to engage in every possible way to mitigate the Department's safety concerns. The mother completed the court-ordered 30-day participation in UA/BA's and did not test positive for any substance except THC. The father, who had refused voluntary participation in random UA/BA testing at the family team decision meeting, relented and voluntarily engaged in and completed 30 days' random UA/BA testing. He, too, tested positive only for THC.

Although Ms. Barnes had not attended the parents' visitation with A.C., she had monitored their participation. She testified they were consistent with visitation, but that the first visitation provider cancelled the referral with the explanation that the father refused to follow its rules prohibiting him from making recordings of his child. She testified that the visitation provider reported that the father was often emotional or belligerent with staff, displaying threatening behavior and constantly confronting staff with conflicts. She testified the provider reported calling law enforcement twice on account of the father's behavior: the first time, because he refused to leave a visit after violating the provider's rule against recording A.C., and the second time because he returned to the premises after the provider limited visitation at its facilities to the mother

alone. Although the Department was aware the parents disputed the visitation provider's version of these events, it did not call anyone from the visitation provider as a witness. Ms. Barnes testified that this first provider reported no problems with the mother, but acknowledged the mother became "somewhat hostile" when they called law enforcement with complaints about the father. RP at 47.

Visitation was thereafter referred to a different provider, where both parents could participate. The second provider did not forbid parental videotaping of A.C.

The mother undertook the court-ordered evidence-based parenting program, a Promoting First Relationships program conducted by Logan Wright. The father voluntarily participated as well, but only for two sessions. The parents' initial intake session with Ms. Wright was on December 2. Ms. Wright was the only provider the Department called as a witness at the fact-finding hearing, and she testified the intake session "went well," although the father "appeared a little frustrated about matters related to visitation and the CPS investigation, but . . . was able to be redirected." RP at 70. In the second session, the mother demonstrated high engagement and attended to A.C.'s needs. Ms. Wright perceived the father as calm and engaged at the outset but testified that his behavior "escalated" as he exhibited frustration about the CPS investigation and

visitation situation.  RP at 70.  Ms. Wright characterized him as "feeling that his rights were being—violated," and "it was difficult to redirect [him] back to the task at hand." RP at 70-71.  At the end of the second session, she recommended that the father disengage from the service in the family's best interest and he was agreeable to that.

Following A.C.'s discharge from the hospital, the parents participated in his medical appointments and feeding therapy.  According to Ms. Barnes, the feeding therapist contacted her after the first Zoom therapy session to express a concern that the father was "very verbally abusive."  RP at 49.  Although the sessions were recorded, the Department did not offer a recording of the session as evidence.  Ms. Barnes participated in the next appointment "to kind of mediate."  *Id.*

Both parents voluntarily began counseling with Frontier Behavioral Health.  Ms. Barnes was aware that both parents had contacted Frontier for treatment and that the mother had begun counseling on December 8, but she did not know if they had been consistent in their attendance.  She had a release of information form for both, but had only recently requested a report on their participation and had not received a response.

Ms. Barnes had communicated with the parents about their housing circumstances and was told by them that they intended to co-parent A.C. and stay in Spokane.  She testified that she spoke with them about pursuing housing options like Catholic Charities

11

and local shelters, but the parents were not interested. She acknowledged that the parents had and would face rejection from some agencies and shelters because of the father's sex offender status. She testified that despite her efforts, no long-term housing solution had been realized. She acknowledged, however, that the parents were then residing at a motel that had been their residence for a couple of weeks. She acknowledged she had not done a walk-through to see if it would be appropriate for A.C.

Ms. Barnes was aware the mother and father received SSI[5] benefits and understood that the parents had stayed in several motels for a few weeks at time. The parents had admitted to her that during the period they had a car, they sometimes stayed in it rather than a motel. The father told Ms. Barnes that they liked to preserve their limited resources for other purposes.

Both parents testified at the fact-finding hearing and disputed the Department's characterization of their relationship and the father's behavior. Their version of the events that led the first visitation provider to call police was that on the first occasion, the father was falsely accused of recording in violation of the facility's policy when he was sending a text message. According to the parents, the father only began recording after he was ordered to leave and was being escorted out. The father testified, "I only record

---

[5] Supplemental Security Income. When asked about the parents' resources, Ms. Barnes testified that the parents were also receiving "TNEF," which might have been a mistranscription of TANF (Temporary Aid for Needy Families). RP at 45.

12

what I feel that I have to protect my integrity, or that somebody's going to say something that I didn't say." RP at 108.

On the second occasion, the mother claims she forgot her diaper bag and contacted the father to request that he deliver it. According to her, she told the provider's staff what she had done, and that A.C.'s father would leave the diaper bag outside. She testified that the provider called law enforcement even though the father never entered or intended to enter its offices.

As for the feeding therapy, the father described it as "awesome." RP at 115. He disputed Ms. Barnes's hearsay report that he had a confrontation with the feeding therapist and testified that since the sessions were recorded on Zoom, anyone who wanted to see his actions could look at the recording.

Both parents testified that they were receiving mental health services from Frontier Behavioral Health. The mother testified that she was speaking with the counselor "like once a week." RP at 125. The father testified that he had a schedule to speak to his psychologist, whom he knew as Kevin, every Monday around 11:00 a.m.

The father admitted to his criminal history but elaborated that his first conviction, in 1997, was for possession of a gram and a half of marijuana. He testified that his sexual battery charge involved a 17-year-old minor. He testified that his failure to register

13

charge arose when he attempted to register but did not have a required $80 fee. He testified that the aggravated battery charge was the result of a plea to a more serious crime than he had committed, but with the State's agreement that the sentence could be served concurrent to time he was already serving.

The mother admitted to having one conviction, for possession of methamphetamine. She testified that she had not used methamphetamine since being released from prison in 2012. She testified that she no longer had contact with her family members "'cause they all do methamphetamines." RP at 134. She testified that she had never been threatened or harmed, physically or emotionally, by A.C.'s father.

On the issue of housing, the father testified that he and the mother sometimes "stayed a couple nights" in the car when they had a car. RP at 79. He refused to accept the Department's characterization that they ever "lived" in a car. *Id.* He testified that other times, they stayed at a friend's house or in a motel. According to the parents, they stayed in at least three different motels during their time in Spokane. The father testified that at the time of the fact-finding hearing, they were living in the Downtowner Motel, which was less expensive than the All Season Motel, where they had previously lived. He testified that he was willing to having Department personnel do a walk-through of their room to make sure it was a suitable residence for A.C.

The parents called as a witness Brent McAllister, the LDS bishop who had arranged for housing for the parents for the first several weeks after A.C. was born. Mr.

14

McAllister testified that his 10 to 12 interactions with the couple had been good. He described the father as "loud" and "passionate about—certain things," but had not observed him to be confrontational. RP at 139-40. He acknowledged that when he was with both parents, the father did most of the talking, but testified he had not seen any sort of controlling behavior or domestic violence between the parents.

It was the Department's position at the fact-finding hearing that foster care was in the best interest of A.C. and would allow the parents further time to engage in services and remedy the Department's concerns. The commissioner was persuaded and entered the following findings in the dependency proceedings for both parents:

> In this case, the court reviewed a lot of information and does have concerns of ongoing mental health issues and aggression and/or violence. It appears to the court that no matter what type of situation the father is in, whether it be at the hospital, visitation, the bus plaza, etc., there is law enforcement involved. Ms. Wright testified that the father's engagement in the parenting program escalated to a point where the focus was no longer on the child or on caring for the child, but rather the focus was on the father's escalation. It appears that at every turn, there is an inability of the father to follow the basic policy/structure of what is required.
>
> Housing is also concern to the court. There has been instability with the parents housing situation since shelter care. The parents were on their way to Tacoma when the car broke down and the mother's water broke at that time.
>
> The past history is also concerning. The mother has prior CPS history where her child was not placed with her. The father reports having power of attorney over the mother. The court also considered testimony that the mother was banging her head on the wall in frustration. There has also been criminal history with the father that involves violence.

> The needs of this child appear to be overshadowed by the parent's actions. It was difficult for the court to follow the testimony of the father's and whether or not he believes these services to be necessary and whether he will follow through with them.
>
> The court is absolutely concerned about the safety of this three month old child. Here we have a child who is only three months and is unable to self-protect and speak for himself. The child was born with THC in his system. The court is concerned about mental health, aggression, chemical dependency, lack of parental experience, and inability to put the child's needs before their own.

CP at 141, 148.

Both parents appealed. The appeals were consolidated.

ANALYSIS

Parents have a fundamental constitutional right to the care, custody, and companionship of their minor child. *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980); *In re Dependency of Schermer*, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). The State has an interest in protecting the physical, mental, and emotional health of children, however, and "when a child's physical or mental health is seriously jeopardized by parental deficiencies, 'the State has a parens patriae right and responsibility to intervene to protect the child.'" *Id.* (quoting *Sumey*, 94 Wn.2d at 762).

A judicial declaration that a child is "'dependent'" will transfer legal custody of the child to the State. *Id.* at 942. There are three statutory bases on which a child may be

16

found dependent; in this case, the Department alleged that A.C. was dependent because he "ha[d] no parent . . . capable of adequately caring for [him], such that [he was] in circumstances which constitute[d] a danger of substantial damage to [his] psychological or physical development." RCW 13.34.030(6)(c).

Time constraints on the Department's ability to gather and present evidence affect the quality of evidence it is required to present at different stages of a dependency proceeding. For example, to obtain a court order directing law enforcement to take a child into custody without notice to the parent, the Department need only file a dependency petition that makes the required allegations of endangerment together with an affidavit or declaration from a Department representative setting forth specific facts that provide a reasonable basis for the allegations and demonstrate a risk of imminent harm to the child. RCW 13.34.050(1).

When a child is taken into custody, a shelter care hearing is required to be held within 72 hours (excluding Saturdays, Sundays, and holidays), the primary purpose of which is to determine whether the child can be immediately and safely returned home while the adjudication of dependency is pending. RCW 13.34.065(1)(a). By statute, hearsay evidence regarding the need or lack of need for shelter care may be offered and

relied on, but must be supported by sworn testimony, affidavit, or declaration of the person offering such evidence.  RCW 13.34.065(2)(c).

The case will then proceed to fact-finding and disposition hearings.  At the fact-finding hearing, the rules of evidence apply.  RCW 13.34.110(1).  Unlike a proceeding to terminate parental rights at which the Department must present clear and convincing evidence of termination factors, at the dependency fact-finding hearing the Department need only establish by a preponderance of the evidence that the child is dependent.  *Id.* The "relatively lenient" preponderance standard has been retained at this stage because, our Supreme Court has explained,

> "A dependency proceeding can be helpful and remedial in preserving and mending family ties because of the social services and dispositional remedies that the State can provide.  Permitting state intervention on a standard of proof lower than a clear and convincing standard is important in providing the necessary flexibility to the State in its attempts to both protect the child and preserve the family."  *In re* [*Dependency of*] *Chubb*, 46 Wn. App. 530, 536-37, 731 P.2d 537 (1987), *aff'd*, 112 Wn.2d 719, 773 P.2d 851 (1989).  "The primary purpose of a dependency is to allow courts to order remedial measures to preserve and mend family ties."  *In re Dependency of T.L.G.*, 126 Wn. App. 181, 203, 108 P.3d 156 (2005).

*Schermer*, 161 Wn.2d at 942-43 (parenthetical omitted).  In a case like this, a dependency can be helpful and remedial in establishing stable family ties when a baby is born into an unstable situation.

18

Nos. 37999-0-III and 38042-4-III (consolidated)
*In re Dependency of A.C.*


I.      SOME OF THE TRIAL COURT'S FINDINGS ARE BASED ON HEARSAY OR ARE
        OTHERWISE UNSUPPORTED BY ADMISSIBLE EVIDENCE

Both parents assign error to the trial court's admission and reliance on extensive

hearsay evidence, and the father assigns error to a number of trial court findings that he

contends are supported only by hearsay or are otherwise unsupported by admissible

evidence.

As previously noted, the rules of evidence apply at a dependency's fact-finding

proceeding. RCW 13.34.110(1). Hearsay—an out-of-court statement offered for its

truth—is inadmissible unless an exception applies. ER 802.

In responding to the father's hearsay objection at the fact-finding hearing, the

Department's lawyer did not cite ER 703 or 705, but relied on the substance of those

rules. ER 703 provides that facts on which an expert bases an opinion need not be

admissible in evidence if they are of a type reasonably relied on by experts in the

particular field in forming opinions. ER 705 provides that an expert may testify to her

opinion and give reasons therefor without disclosing the underlying facts unless the judge

requires otherwise, or unless queried about the underlying facts in cross-examination.

" " " '[I]t does not follow [from these rules] that such a witness may simply report

[these underlying] matters to the trier of fact: The Rule was not designed to enable a

witness to summarize and reiterate all manner of inadmissible evidence.'"'"  *In re Det. of Marshall*, 156 Wn.2d 150, 162, 125 P.3d 111 (2005) (quoting *State v. DeVries*, 149 Wn.2d 842, 848 n.2, 72 P.3d 748 (2003) (quoting *State v. Martinez*, 78 Wn. App. 870, 880, 899 P.2d 1302 (1995) (quoting 3 DAVID W. LOUISELL & CHRISTOPHER B. MUELLER, FEDERAL EVIDENCE § 389, at 663 (1979)))).  And "'courts have been reluctant to allow the use of ER 705 as a mechanism for admitting otherwise inadmissible evidence as an explanation of the expert's opinion.'"  *Martinez*, 78 Wn. App. at 879 (quoting *State v. Anderson*, 44 Wn. App. 644, 652, 723 P.2d 464 (1986)).  The rules "should not be construed so as to 'bootstrap' into evidence hearsay that is not necessary to help the jury understand the expert's opinion."  *Id.* at 880.  When such evidence is admitted, it is not substantive evidence.  *Id.* at 879.

Accordingly, ER 703 and 705 permit an expert to identify facts she deemed material so that a trier of fact can weigh *the expert's opinion* against other admissible, substantial evidence.  In a dependency proceeding, they do not permit hearsay information a social worker has gathered to *serve* as evidence, as was made clear in this court's opinion in *In re Welfare of X.T.*, 174 Wn. App. 733, 737, 300 P.3d 824 (2013).

In *X.T.*, a Department social worker assigned to X.T.'s case was its only witness at a fact-finding hearing, where she detailed the Department's file information on the

family, including the initial referral, the hospital's referral, and medical records.  *Id.* at

736.  The social worker also testified about the father's lengthy criminal history without

the support of any exhibits.  *Id.*  The only evidence presented by the Department that this

court found on appeal to have been nonhearsay was evidence that the father had missed

several recent visits with X.T., had been late to others, and had declined to submit to

urinalyses that were not court ordered, but that the Department had requested.  *Id.* at 739.

For the trial court in a fact-finding hearing to permit Department social workers to

testify to more hearsay than can be justified under ER 703 and 705 does not necessarily

require reversal.  "'[I]n the absence of evidence to the contrary, we presume the judge in

a bench trial does not consider inadmissible evidence in rendering a verdict.'"  *State v.

Gower*, 179 Wn.2d 851, 855, 321 P.2d 1178 (2014) (quoting *State v. Read*, 147 Wn.2d

238, 242, 53 P.3d 26 (2002)).  The *Read* presumption does not apply when the judge

actually considers inadmissible matters in making its findings, however.  *Id.* at 856.  The

presumption can be rebutted by showing that a verdict is not supported by sufficient

admissible evidence or that the judge relied on the inadmissible evidence to make

essential findings that it would not otherwise have made.  *Id.*

In *X.T.*, this court determined that the trial court did not limit consideration of the

social worker's testimony to demonstrate how she arrived at her opinions.  *Id.* at 738.  It

was clear that the court had considered the testimony as offered for the truth of the matter asserted because it adopted all of the allegations of the dependency petition as findings. *Id.* at 738-39. This court held that the error was not harmless because the scant admissible evidence did not establish a reasonable probability that X.T. was a dependent child. *Id.* at 739.

Here, too, we can see that the trial court considered some of the Department's hearsay evidence for its truth. The father assigns error to the trial court's finding that, "*It appears to the court that no matter what type of situation the father is in, whether it be at the hospital, visitation, the bus plaza, etc., there is law enforcement involved.*" CP at 148 (emphasis added). "No matter what type of situation the father is in" is an overstatement, since the evidence of law enforcement involvement at the fact-finding hearing was limited to three situations: the hospital, visitation, and an incident with a security guard at the Spokane bus plaza. The parents' testimony as to the three situations was that the father did nothing wrong and law enforcement unnecessarily became involved. For these findings to support the ultimate finding of dependency, the trial court must have relied on Ms. Woodward's and Ms. Barnes's hearsay testimony about reports by third parties as being true.

Nos. 37999-0-III and 38042-4-III (consolidated)
*In re Dependency of A.C.*

The same is true of the trial court's challenged finding that, "*It appears that at every turn, there is an inability of the father to follow the basic policy/structure of what is required*." CP at 148 (emphasis added). The only nonhearsay testimony about the father's inability to follow a required structure was Ms. Wright's testimony that the father had difficulty staying engaged in the second Promoting First Relationships session. Ms. Wright attributed it to his frustration with the CPS investigation and visitation situation.[6] Here, too, the trial court's finding about the father's failures "at every turn" must have relied on the social workers' hearsay testimony about third party reports for their truth.

The question that remains is whether the error was harmless. That turns on the sufficiency of the admissible evidence to support the finding of dependency, the issue we turn to next.

---

[6] We recognize that a parent's bad attitude about Department involvement and service provider policies makes the social workers' and providers' jobs more difficult, but unless the Department can show that the bad attitude renders a parent incapable of adequately caring for a child such that the child faces a danger of substantial damage to his physical or psychological development, it does not support a finding of dependency. To quote a former colleague's observation in a termination of parental rights case, "While [the mother] had a duty to comply with all ordered services, no statute or rule required her to do so with a smile on her face." *In re D.R.*, No. 30298-9-III, slip op. at 8 (Wash. Ct. App. Oct. 15, 2013) (unpublished), https://www.courts.wa.gov/opinions/pdf/302989 .unp.pdf.

And while a better-developed record might explain the first visitation provider's "no recording" policy, it is not surprising to this panel that a parent would be disappointed and even unhappy about a visitation provider's refusal to allow the parent to photograph or videotape their new baby—particularly a baby they are only permitted to visit several hours a week.

23

Nos. 37999-0-III and 38042-4-III (consolidated)
*In re Dependency of A.C.*

II.    AT THIS STAGE OF THE TRIAL COURT PROCEEDINGS, THE EVIDENCE WAS
       SUFFICIENT

A dependency hearing is a "'preliminary, remedial, nonadversary proceeding' that does not permanently deprive a parent of any rights." *In re Welfare of Key*, 119 Wn.2d 600, 609, 836 P.2d 200 (1992) (quoting *In re Matter of A.W.*, 53 Wn. App. 22, 30, 765 P.2d 307 (1988)). A dependency determination requires a showing of parental deficiency, but not parental unfitness. *Schermer*, 161 Wn.2d at 943. The determination also requires showing a danger of harm, but not proof of actual harm. *Id*. at 951. The trial court has broad discretion to evaluate the risk of harm. *Id.*

In reviewing a finding of dependency, we do not reweigh evidence or reassess witness credibility. *In re Dependency of CA.R.*, 191 Wn. App. 601, 609, 365 P.3d 186 (2015). We will affirm an order of dependency if substantial evidence supports the trial court's findings of fact and the findings support the conclusions of law. *In re Dependency of M.P.*, 76 Wn. App. 87, 90, 882 P.2d 1180 (1994); *Schermer*, 161 Wn.2d at 952. Given the preponderance standard applied in the fact-finding hearing, substantial evidence exists if, when viewing the evidence in the light most favorable to the prevailing party, a rational trier of fact could find the fact more likely than not to be true. *X.T.*, 174 Wn. App. at 737.

24

It would have been more helpful for the trial court to have heard from prescient witnesses than to hear the social workers' reports of what they were told.  As it was, the parents could be cross-examined about their version of events, but third-party reports of information critical of the parents could not be cross-examined.  It is understandable and permissible for the Department to rely on hearsay from a social worker at the shelter care hearing.  But the Department had almost three months thereafter during which the parents had visitation and participated in services, with providers who could have been called and testified to firsthand knowledge.  The Zoom format of the hearing would have made calling hospital staff or providers as witnesses relatively convenient.

Nevertheless, viewing the admissible evidence in the light most favorable to the Department, the trial court could reasonably find it more likely than not that evidence of the mother's limitations, possible domestic violence in the relationship, and the father's marijuana use presented a danger of harm to A.C.

The father told Ms. Woodward that the mother is unable to care for herself and that he is the only one who cares for her.  It was undisputed that the mother goes along with the father holding a power of attorney under which, according to him, he makes all the decisions even though it does not appear the mother is incompetent, but only possibly developmentally delayed.  Ms. Woodward testified that the father explained to her that

the power of attorney "means that he has full control over [the mother]. That he controls everything she can do." RP at 19. She testified that when she sought to speak with the mother alone, the father answered that she could not, "because I have power of attorney over her so I have to speak for her." RP at 20. The mother disputed that the father was physically or emotionally abusive to her, but she appears to have no other support system, admitting that she has no support and seeks no support from her family.

The trial court recognized Ms. Woodward as an expert in identifying signs of domestic violence based on Ms. Woodward's social work education (undergraduate and master's degrees, as well as work toward her doctorate degree), her law enforcement training in domestic violence, and her work history. Ms. Woodward testified it was common in domestic violence relationships for physical and/or emotional abuse to take place in private, with the outward signs being only controlling behavior on the part of the perpetrator and controlled behavior on the part of the victim. Ms. Woodward and Ms. Barnes testified that it was those behaviors in the father and mother that had concerned hospital staff initially and led the two of them to fear that there is domestic violence in the relationship. It was those behaviors that led the Department to seek domestic violence assessments of both parents. We cannot say that the trial court abused its broad discretion to evaluate the risk of harm.

26

The trial court's finding that the father may have a substance abuse problem with marijuana use was supported by Ms. Woodward's testimony that she had seen postings by the father of videos on Facebook that showed him using marijuana "quite a bit," "throughout the day," to the point that "it's very obvious that it's affecting how he's acting." RP at 18. While the father testified that he only smokes marijuana "[m]aybe once a week . . . depending on our budget," the trial court evidently found Ms. Woodward's testimony to be more credible, a judgment that was the trial court's to make. RP at 91.

The Department did not challenge the father's testimony that the couple's resources had sufficed to cover their housing in low-cost motels for much of their time in Spokane. The evidence supports the trial court's finding that "[t]here has been instability with the parents housing situation," although the fact that the parents have not found a long-term housing solution would not be enough, standing alone, to support the finding of dependency. CP at 141, 148. Still, assistance with housing is a service that the Department can provide for the couple, and the father testified at the fact-finding hearing that "at the last hearing they . . . said that they were going to help us acquire housing," and "we would appreciate the help if they can help us." RP at 113.

The dependency determination is supported by substantial evidence that to ensure A.C.'s safety, the parents needed the helpful and remedial services that a dependency makes available to them.

27

Nos. 37999-0-III and 38042-4-III (consolidated)
*In re Dependency of A.C.*

Affirmed.[7]

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

Siddoway, C.J.
_____
Siddoway, C.J.

WE CONCUR:

_____
Staab, J.

_____
Fearing, J.

---

[7] The father separately assigns error to the court's order requiring him to undergo a chemical dependency evaluation and domestic violence assessment as part of the dependency disposition. Br. of Appellant V.C. at 3. We review a court's decision to order a particular service for abuse of discretion. *In re Dependency of W.W.S.*, 14 Wn. App. 2d 342, 364, 469 P.3d 1190 (2020). The trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. *In re Dependency of BF*, 197 Wn. App. 579, 586, 389 P.3d 748 (2017). Where the evidence is unreliable or insufficient to show that a parent has an issue that requires remedying as a parental deficiency, a trial court abuses its discretion by ordering services related to that issue. *W.W.S.*, 14 Wn. App. 2d at 364-65. Conversely, a juvenile court can order evaluations or assessments that are attuned to the needs of an individual case. *BF*, 197 Wn. App. at 587.

Because the chemical dependency evaluation and domestic violence assessment ordered by the court address concerns about parental deficiencies that we have concluded were based on substantial evidence, no separate analysis of this assignment of error is required.

28